684 P.2d 888

Jose COTA and Dorothy Cota, husband and wife, Plaintiffs/Appellees,

v.

HARLEY DAVIDSON, A DIVISION OF AMF, INCORPORATED and AMF, Incorporated, Defendants/Appellants.

2 CA–CIV 4959.

Court of Appeals of Arizona, Division 2.

March 21, 1984.

Rehearing Denied April 11, 1984.

Review Denied June 8, 1984.

**8**

Law Offices of Richard D. Grand by James G. Heckbert, Tucson, for plaintiffs/appellees.

Murphy & Hazlett by Thomas M. Murphy and Mary V. Moisio, Tucson, for defendants/appellants.

## OPINION

HOWARD, Judge.

This products liability case involved a collision between a motorcycle and an automobile. The jury returned a verdict in favor of Jose Cota for $3,500,000 and in favor of his wife, Dorothy, for loss of consortium, in the sum of $175,000. Defendants contend the trial court erred in (1) denying its motion for a mistrial because of jury misconduct; (2) denying its motion to bifurcate the issues of liability and damages; (3) precluding defendants' use of the defenses of assumption of risk, product misuse and unforeseeable use; (4) limiting the admission of the facts surrounding the accident, and (5) denying its motion for a mistrial because of improper argument to the jury. We affirm.

On March 21, 1980, at approximately 6:40 p.m., the plaintiff, Jose Cota, was driving a 1973 Harley-Davidson Electraglide motorcycle in a southerly direction on State Route 77, north of Mammoth, Arizona, when it collided with a northbound 1978 Toyota pickup truck operated by Virginia M. Saliz. As a result of the collision, one of the gasoline tanks on the motorcycle ruptured, resulting in a fire which seriously burned a 21-year-old Jose Cota. As a result of the burns, Cota lost his ears, most of his fingers, and his right leg above the knee.

Plaintiffs claim the motorcycle was defective in its design according to the "crashworthiness" theory and brought suit against defendants under the doctrine of strict liability.

Testifying for plaintiffs was Dr. Kenneth Saczalski, a professor of engineering at Northern Arizona University. He had formerly worked with the Office of Naval Research in the area of crashworthiness and also organized and worked with other researchers in the federal government including the Federal Aviation Administration, National Highway Traffic Safety Administration, Federal Railway Administration, the United States Army and the United States Air Force. While he was associ-

ated with the Office of Naval Research, Dr. Saczalski was appointed to serve as an advisor to the Secretary of Transportation and work directly with the National Highway Traffic Safety Administration. During this period of time he was chairman of the Motorcycle Safety Committee and vice-chairman of the Crashworthiness Safety Committee.

It was Dr. Saczalski's opinion that at the time of first contact both vehicles were traveling at approximately 50 mph and coming towards each other at an oblique angle. (The speed limit in the area was 55 mph.) The front wheel of the motorcycle collided with the right front tire and wheel well area of the truck. Then the motorcycle slid along and impacted various parts of the right side of the truck. The motorcycle was equipped with a fairing and windshield which were attached to the motorcycle by the right and left fairing brackets which extended from their bolted positions on the outboard side of the front forks, to above the handlebars. It was Dr. Saczalski's opinion that the fire was cause by a hole in the right gas tank which was in turn caused by the penetration of the tank by the motorcycle's right fairing bracket. Dr. Saczalski testified that the bolts attaching the right fairing bracket were sheered in the collision, causing the bracket to be propelled rearward in a spearlike fashion into the right gas tank. Dr. Saczalski further testified that the location of the bracket and its design were defective making the motorcycle unreasonably dangerous due to the likelihood of frontal impact between motorcycles and other vehicles.[1]

Dr. Saczalski further testified that there were safer alternative designs which would have obviated the defect but which would not have changed the utility, increased the cost significantly, nor brought any adverse consequences to the motorcycle. He stated that the design of the fuel tanks themselves was defective and unreasonably dangerous because they could be easily penetrated. He also stated that there were safer alternative tank designs which would have prevented the fire.

The plaintiffs also called Dr. Harry Peterson, professor of engineering at the Colorado School of Mines. From 1969 through 1976, Dr. Peterson worked on a series of contracts for the National Highway Traffic Safety Administration of the Department of Transportation where he helped in the investigation of the dynamics of motorcycle impacts. Dr. Peterson also believed that the fire was caused by the penetration of the right fairing bracket into the right gas tank and that the design of the fairing bracket and fuel tank of the 1973 Harley Davidson Electraglide were defective so as to make the motorcycle unreasonably dangerous in foreseeable impact situations. Dr. Peterson also stated that there were practical alternative designs which would have prevented the fire on this occasion.

Both Drs. Saczalski and Peterson stated that although the collision in this case occurred at highway speeds, the same result would have occurred if each vehicle were traveling at speeds between 20 and 30 mph.

Both of the expert witnesses called by defendants testified that, in their opinion, the accident was not caused by the motorcycle's right fairing bracket but by a bracket on the Toyota pickup which affixed the right outside rearview mirror to the truck. They felt the design and placement of the fairing brackets was not unreasonable, and that the alternative tank design as proposed by plaintiffs' expert witnesses was not practical.

1. The evidence at trial showed that over 30 per cent of all impacts to motorcycles are to the front portion of the vehicle. Sixty to 70 per cent of all motor vehicle impacts deal with the motorcycle colliding with an object within 30 degrees of the front of the motorcycle. These figures concerning the incidents of frontal motorcycle impacts were available to motorcycle manufacturers prior to 1973, the date of the manufacture of the motorcycle. there was also testimony that in a 1980 study of motorcycle collisions in Los Angeles, four per cent of those collisions studied revealed severe rupture of the gasoline tanks. This would indicate that of the 5,000 motorcycle collisions in Los Angeles County alone, 200 would receive severe ruptures of the fuel tanks.

Prior to trial defendants filed a motion to bifurcate, requesting separate trials on the issues of liability and damages. This motion was denied. Also, prior to trial, plaintiffs moved the trial court to exclude any evidence of the fact that plaintiff, Joe Cota, had been drinking prior to the accident and that he was driving on the wrong side of the road when he collided with the pickup truck. The trial court agreed with the motion and ordered that evidence of the "cause" of the basic accident would be excluded; however, evidence of the mechanics of impact, such as point of impact, speed of the vehicles, angle of the vehicles on impact, physical evidence at the point of the impact, point of risk, and skid marks would not be excluded. The trial court also instructed the jury both at the start of the trial and in its final instructions that the circumstances which led to the collision were not for their consideration and they were not to speculate as to how the collision occurred.

After voir dire of the jury panel by the court, ten jurors were sworn and seated. Two alternate jurors were designated, Reginald D. Lewis and John W. Schafer. After three days of the nine-day jury trial, juror Lewis informed the court, out of the presence of the other jurors, that he did not feel that he could be fair and impartial because he disliked the plaintiffs' lawyers, who at one time sued his business partner. He further stated that he liked motorcycles and looked upon plaintiffs' case as an attack on motorcycles. Lewis informed the court that he had just recently told the other jurors that one of plaintiffs' attorneys had ruined his life at one point in time and that he would be unable to be fair in the case. Lewis was excused after voir dire by the court. The following morning the court conducted voir dire of each juror individually, and out of the presence of the other jurors, concerning any statements made by Lewis. Some jurors denied ever having heard Lewis say anything about plaintiffs' attorney. Other jurors said that they heard him make the statement but paid no attention to it. Each juror answered the court under oath that he or she would be able to be fair and impartial and they would base his or her decision only on the evidence heard from the witness stand and pursuant to the instructions given by the court. Juror Nancy Johnston stated that she had a discussion with Lewis concerning the center of gravity on a motorcycle, but that she would judge the case only on the evidence that she heard under oath from the witness stand.

After the court completed its voir dire the defendants moved for a mistrial arguing that because Lewis stated that he disliked plaintiffs' counsel, the other jurors would bend over backwards in favor of plaintiffs to show they were impartial. Defendants also felt that the discussion between Lewis and Johnston concerning the center of gravity of the motorcycle would also be reason for a mistrial. Defendants did not move that Johnston be excused and replaced with an alternate juror. The trial court denied the motion for a mistrial.

## JURY MISCONDUCT

If there has been misconduct on the part of a juror, the grant or denial of a motion for mistrial is a matter within the sound discretion of the trial court. *Hallmark v. Allied Products Corporation*, 132 Ariz. 434, 646 P.2d 319 (App.1982); *Ulan v. Richtars*, 8 Ariz.App. 351, 446 P.2d 255 (1968). Prejudice will not be assumed, but must appear probable from the record. *Shell Oil Company v. Gutierrez*, 119 Ariz. 426, 581 P.2d 271 (App.1978). The trial court commands the best position to determine what effect, if any, alleged misconduct might have had upon other jurors and whether a mistrial should be granted. See *State v. Reynolds*, 11 Ariz.App. 532, 466 P.2d 405 (1970).

There is nothing affirmatively shown on the record which would demonstrate prejudice on the part of the jurors towards the defendants. If Lewis' remarks were prejudicial to anyone, they were prejudicial to plaintiffs, not defendants. Defendants' theory that the jury would be inclined to lean over backwards to

show that it was not prejudiced is sheer speculation and cannot serve as the grounds for mistrial. The trial court did not abuse its discretion by denying the motion on that ground.

■ During the trial, defendants' attorney had asked one of plaintiffs' expert witnesses where the center of gravity was on the motorcycle. This witness stated that he did not know. In the jury room, Lewis, out of his expertise as a motorcycle rider, showed Johnston where the center of gravity was. Since there was no issue in this case as to the center of gravity of the motorcycle and its location was never in dispute, there is absolutely no way in which defendants could have been prejudiced by Lewis' conduct, and the trial court did not err in denying a mistrial on this ground either.

## FAILURE TO BIFURCATE THE ISSUES

The motion to bifurcate was filed approximately one month prior to trial. The motion pointed out that it would be an extremely long and complicated trial, that Cota could not remember the accident and that the jury might be prejudiced on the liability issue by his injuries.

Plaintiffs opposed the bifurcation. It is apparent from their opposition that they feared that defendants' only purpose in making the motion was an attempt to exclude Cota's appearance in the courtroom during the trial of the liability issue. The opposition pointed out to the trial court that Cota's presence on the issue of liability might be necessary, since defendants were claiming contributory negligence, assumption of risk and improper use of the motorcycle. Plaintiffs also claimed that the testimony concerning the damage issue was inextricably woven into the liability issue and that the medical testimony would be relatively short, as would all the rest of the testimony on damages.

On appeal, defendants, pointing to the moving and emotional testimony of Mrs. Cota on the effect of Cota's injuries, contend that the jury's determination of liability was unfairly influenced, to their detri-

ment, by this testimony. Therefore, defendants contend the court erred in refusing to try the liability and damage issues separately. We do not agree.

■ Rule 42(b), Arizona Rules of Civil Procedure, 16 A.R.S., states:

"The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury."

The trial court is given broad discretion in deciding whether to exercise the severance power of Rule 42(b). *Morley v. Superior Court of Arizona In and For Maricopa County,* 131 Ariz. 85, 638 P.2d 1331 (1982); *Purcell v. Zimbelman,* 18 Ariz.App. 75, 500 P.2d 335 (1972). The State Bar Committee Note following the rule recognizes that the separation of issues for trial is not to be routinely ordered. Under the state of the pleadings at the time of the motion to bifurcate was made, the defenses of contributory negligence, assumption of risk and product misuse were still in the case. There was reason for the trial court to believe, as represented by the plaintiffs, that Cota might testify in the liability phase of the case even though he did not remember the accident itself. In such case the jury would have been able to observe Cota and would have been well aware of the extent and nature of his injuries. This case is to be distinguished from that of *Morley v. Superior Court of Arizona In and for Maricopa County,* supra. In that case, the plaintiff was comatose, and the Supreme Court held that the trial judge did not err in separating the issues of liability and damages and in excluding the presence of the comatose plaintiff from the courtroom during the liability phase of the trial. *Morley* bears no resemblance to this case, and the trial court did not err in denying the motion to bifurcate.

PRECLUSION OF DEFENSES OF AS-
SUMPTION OF RISK, PRODUCTS
MISUSE, AND UNFORESEEABLE
USE—CRASHWORTHINESS DOC-
TRINE

Defendants' contention that the trial court erred in refusing to instruct the jury on assumption of risk, product misuse and unforeseeable misuse first requires a discussion of the theory upon which this case was tried—the "crashworthiness" theory. This theory first came to light in the case of *Larsen v. General Motors Corporation,* 391 F.2d 495 (8th Cir.1968). There the design defect was in the steering assembly which caused the shaft to be displaced rearward in a head-on collision, striking the plaintiff in the head. The district court granted a summary judgment to the defendant, relying on the decision of the Seventh Circuit in *Evans v. General Motors Corporation,* 359 F.2d 822 (7th Cir.1966), cert. den., 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966), which held that the manufacturer has no duty to design a car which will be accident-proof. The court also held that there was no duty to warn since a warning is required only when a product is unsafe for its intended use, and the participation in a head-on collision is not an intended use of the car.

The Eighth Circuit disagreed stating:
"Automobiles are made for use on the roads and highways in transporting persons and cargo to and from various points. This intended use cannot be carried out without encountering in varying degrees the statistically proved hazard of injury-producing impacts of various types. The manufacturer should not be heard to say that it does not intend its product to be involved in any accident when it can easily foresee and when it knows that the probability over the life of its product is high, that it will be involved in some type of injury-producing accident." 391 F.2d at 501–502.

The court's opinion in *Larsen* finds support in W. Prosser, Law of Torts § 96, 644–46

(4th ed. 1971), and Restatement (Second) of Torts, §§ 398, 435 (1965), which state:
"§ 398.   Chattel Made Under Dangerous Plan or Design
A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design."
"§ 435.   Foreseeability of Harm or Manner of Its Occurrence.
(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.
(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm."

Since *Larsen,* there has been a legion of cases on the crashworthiness theory. See Annot., 42 A.L.R.3d 560, (1972). This doctrine has been applied in strict liability cases involving defective vehicular gasoline tanks. See *Buehler v. Whalen,* 70 Ill.2d 51, 15 Ill.Dec. 852, 374 N.E.2d 460 (as modified March 14, 1978); and see Annot., 96 A.L.R.3d 265 (1979). The crashworthiness doctrine has also been applied in strict liability cases involving motorcycles. See *Taylor v. American Honda Motor Company, Inc.,* 555 F.Supp. 59 (M.D.Fla.1982); *Nicolodi v. Harley-Davidson Motors Company, Inc.,* 370 So.2d 68 (Fla.Dist.Ct.App. 1979); *Stueve v. American Honda Motors Company, Inc.,* 457 F.Supp. 740 (D.Kan. 1978) (allegedly defectively designed gas tank which caused burns which killed the rider).[2]

**2.**  Cf. *Hunt v. Harley-Davidson Motor Company, Inc.,* 147 Ga.App. 44, 248 S.E.2d 15 (1978) (no

basis for recovery where the rider was aware of the absence of crash bars on his motorcycle as

The *Nicolodi* case is especially pertinent since it involved an allegedly defectively designed motorcycle. Holding the doctrine of strict liability applicable, the court stated:

"In each of these cases the automobile manufacturer argued that its duty of reasonable care in the design and construction of an automobile is met when the automobile is safe for its intended use and that 'intended use' does not include involvement in an accident. The courts rejected that argument by applying basic principles of negligence. They reasoned that a manufacturer's duty of reasonable care extends to those results which are reasonably foreseeable and involvement in an accident is a reasonably foreseeable use of an automobile; therefore, an automobile manufacturer's duty of reasonable care in the design and manufacture of an automobile must taken into consideration the injury—producing effects of an impact. The court in the *Larsen* case said:

'This duty of reasonable care in design rests on common law negligence that a manufacturer of an article should use reasonable care in the design and manufacture of its product to eliminate any unreasonable risk of foreseeable injury. The duty of reasonable care in design should be viewed in light of the risk. While all risk cannot be eliminated nor can a crashproof vehicle be designed under the present state of the art, there are many commonsense factors in design, which are or should be well known to the manufacturer that will minimize or lessen the injurious effects of a collision. The standard of reasonable care is applied in many other negligence situations and should be applied here.'

The *Larsen* court specifically rejected the notion that it was placing automobile manufacturers in a special class, saying

'[w]e think the duty of the use of reasonable care in design to protect against foreseeable injury to the user of a product and perhaps others injured as an incident of that use should be and is equally applicable to all manufacturers with the customary limitations now applied to protect the manufacturer in case of unintended and unforeseeable use.'

In arguing that the crashworthiness doctrine should not apply to the manufacturer of a motorcycle, appellee proposes a restrictive interpretation of the holdings in *Larsen* and *[Ford Motor Company v.] Evancho*, [327 So.2d 201 (Fla. 1976)]. First, appellee says that the courts in those cases placed a duty on the manufacturer of an automobile to provide a means of safe transportation and it is ludicrous to propose that a motorcycle could be made safe. As stated by appellee, 'a motorcycle is a motorcycle is a motorcycle, and, because it is what it is, it is inherently not safe to crash in.' In other words, appellee asserts that a motorcycle cannot be made crashworthy and the crashworthiness doctrine cannot logically, or in commonsense, be extended to motorcycle manufacturers. We reject that argument.

It is clear that the crashworthiness doctrine is simply an aspect of basic principles of negligence and we have no difficulty in finding that these principles extend to motorcycle manufacturers as well as to automobile manufacturers. It is just as foreseeable that a motorcycle will be involved in an accident as it is foreseeable that an automobile will be involved in an accident. Foreseeability is the conceptual cornerstone of the crashworthiness doctrine." 370 So.2d at 70–71.

A.R.S. § 12–683(3) recognizes the foreseeable use doctrine when it states that in any product liability action a defendant

well as the danger of riding a motorcycle without crash bars); and see *Bolm v. Triumph Corporation,* 33 N.Y.2d 151, 350 N.Y.S.2d 644, 305 N.E.2d 769 (1973) (manufacturer has no duty to design a product which is accident-proof, but

user does not assume dangers from unknown or latent defects which the manufacturer can reasonably foresee will cause injury on impact); and see generally, Annot., 98 A.L.R.3d 317 (1980).

**14**

shall not be liable if the defendant proves that:

> "The proximate cause of the incident giving rise to the action was a use or consumption of the product which was for a purpose, in a manner or in an activity other than that which was *reasonably foreseeable ....*" *(Emphasis added.)*

The crashworthiness theory as enunciated in *Larsen* applies in Arizona.

■ All the expert witnesses, both plaintiffs and defendants, testified that a manufacturer of a motorcycle should, in designing the product, take into consideration the likelihood of the vehicle's being involved in an accident. The uncontradicted evidence was that the same result would have occurred here at speeds of between 20 to 30 miles per hour. Under the crashworthiness doctrine, there was no misuse and therefore no entitlement to an instruction on misuse. The court instructed the jury as follows:

> "A motorcycle manufacturer is under no duty to design an accident-proof or injury-proof vehicle. However, such a manufacturer is under a duty to design its motorcycles such that they do not subject the user to an unreasonable danger or unreasonably risk of injury in the event of a foreseeable collision.
>
> A party who manufactures and sells a defective product is liable if the defect causes injury and if the defect causes the product to be unsafe for a reasonably foreseeable use, even though the manufacturer has exercised all possible care in the preparation and sale of its product."

Whether the instant case dealt with a foreseeable collision and whether or not the motorcycle subjected Cota to an unreasonable danger or unreasonable risk of injury was left for the jury's determination, and it was sufficiently instructed on the issue of foreseeable use.

**3.** The defense of assumption of risk is still available as an affirmative defense in a products liability case, when the cause of action accrued after 1978, by virtue of A.R.S. § 12–682 which states:

■ Defendants were not entitled to an instruction on assumption of risk.[3] In order for the doctrine of assumption of risk to be applicable, a general knowledge of a danger is not sufficient but, rather, the plaintiff must have actual knowledge of the specific risk which injured him and appreciate its magnitude. *Garcia v. City of South Tucson*, 131 Ariz. 315, 640 P.2d 1117 (App.1982). In an offer of proof made before the trial court by appellee, Cota testified that he understood and appreciated the fact that it is easier to be injured on a motorcycle than an automobile, that if a person is riding a motorcycle in a wrong lane of traffic he may be hurt, and that if a person punched a hole in a gasoline tank the gas would pour out and could be ignited by a flame or spark nearby. Appellees contend that this testimony entitled him to an instruction on assumption of risk. We do not agree. The testimony shows no more than a general knowledge of danger. It does not show that Cota knew that the tank could be penetrated by the fairing bracket nor did it show that he knew that the gas tank was capable of being ruptured by a mirror bracket at a speed between 20 and 30 mph. The trial court correctly refused any instructions on assumption of risk.

## LIMITING THE FACTS SURROUNDING THE ACCIDENT

■ Defendants contend the trial court erred in refusing to allow into evidence the fact that Cota had been drinking prior to the accident and that his motorcycle was in the wrong lane of traffic at the time of the collision. We do not agree. Defendants' thinly veiled reason for wanting this evidence to be brought to the jury's attention was to paint Cota as a wrongdoer and hope the jury would take that into consideration in either denying liability or in limiting damages. Such a purpose would be im-

"The previously existing common law of products liability is modified only to the extent specifically stated in this article and § 12–551."

proper. The evidence was irrelevant, and the trial court properly excluded it.

## IMPROPER JURY ARGUMENT

 During closing argument, plaintiffs' attorney told the jury that they should "send a message" to defendants, so that the injury suffered by Cota would not happen to any other motorcycle rider. Defendants contend that this type of argument is clearly a "punitive damage argument" and improper, since punitive damages were not at issue in the trial, and that the trial court erred in denying their motion for mistrial based on this argument. We do not agree.

One of defendants' theories at trial was that the motorcycle was not defectively designed, because it was the only thing practical and it was designed in the same manner as was being designed by the entire motorcycle industry. Plaintiffs argued in their rebuttal:

> "You have more power than the president of the United States, because you and only you can right a wrong, and you and only you can decide the credibility of the witnesses. You and only you can send a message to the motorcycle industry, can send a message to Harley-Davidson and the A.M.F. and say, This isn't going to happen anymore."

This was not a punitive damage argument and was entirely proper in the context of the manner in which the case was tried.

Affirmed.

BIRDSALL, C.J., and HATHAWAY, J., concur.