775 P.2d 1148

**Rosa GONZALES, Personal Representative of the Estate of Lupe Madrid Gonzales, Jr., Deceased; Rosa Gonzales, Individually and on behalf of Lupe M. Gonzales, III, David Gonzales and Adam Gonzales, minors, Plaintiffs/Appellees,**

v.

**ARIZONA PUBLIC SERVICE COMPANY, an Arizona corporation, Defendant/Appellant.**

**No. 2 CA–CV 88–0269.**

Court of Appeals of Arizona, Division 2, Department B.

Feb. 23, 1989.

Review Denied June 27, 1989.*

---

* Cameron, J., of the Supreme Court, recused himself and did not participate in the determination of this matter.

Kleinman, Carroll & Kleinman by Frank E. Lesselyong, Phoenix, for plaintiffs/appellees.

Snell & Wilmer by Warren E. Platt and Eileen J. Moore, Phoenix, and Arizona Pub-

lic Service Co. by Janice H. Moore, Phoenix, for defendant/appellant.

## OPINION

ROLL, Judge.

Defendant Arizona Public Service Company (APS) appeals from a jury verdict awarding the estate of Lupe Gonzales, Jr., his wife, and surviving children, $1,550,000 in compensatory damages in connection with a wrongful death action following his electrocution. For the reasons set forth below, we affirm.

## FACTS

Thirty-two-year-old Lupe Madrid Gonzales, Jr., was the husband of Rosa Gonzales and father of three children. The family resided in Coolidge. He worked full time at Frito Lay as a corn cook and supplemented his income by doing part-time yard work in Coolidge.

Vicky Burden Espinosa owned a residence on West Pinkley in Coolidge. A large elm tree, approximately 66 feet tall, was situated on the premises. APS power lines were located in the alley between West Pinkley and Central Streets. The power lines included service lines to the various houses. These service lines were insulated. However, the power lines also included primary lines which carried 14,200 volts of electricity through uninsulated wire. These primary lines were situated at the top of the power poles approximately 28 feet off of the ground.

Seventy-six-year-old Easter Davidson lived next door to the Espinosa property. The branches from the large elm tree extended from the Espinosa property line and across her property. At least one branch extended over the primary power lines in the alley. The base of the Espinosa elm tree was located about 20 feet from the power line. Mrs. Davidson feared that limbs from the Espinosa tree would damage the power lines, possibly causing a power outage. She described seeing sparks from the power lines on windy days when the tree branches brushed against the lines. Mrs. Davidson reported the perceived danger to APS. On another occasion, she personally asked an APS crew in the vicinity to trim the tree. The crew told Mrs. Davidson that they would charge $200 to trim the Espinosa tree. APS repeatedly declined to take action regarding the tree.

APS was required to comply with provisions of the National Electrical Safety Code, including Section 281, Subsection 1. That provision states in part: "Trees which may interfere with ungrounded supply connectors should be trimmed or removed."

Ultimately, Mrs. Davidson asked Vicky Espinosa if she would split the cost of hiring someone to trim the tree. Espinosa declined. Mrs. Davidson then asked Lupe Gonzales if he would trim the tree. Gonzales agreed to do the job for $100.

On February 28, 1986, Lupe Gonzales climbed the Espinosa elm tree and used an electric chainsaw to cut a branch which was approximately 30 feet long and which extended over the primary power lines. He attached a chain from the branch which he was cutting to a branch immediately above that branch in order to prevent the severed branch from striking the power line. Gonzales had told his wife that he feared that a falling branch would damage the line and he would be required to pay for any damage resulting therefrom.

When Gonzales cut the branch, it struck one of the primary power lines. The tree branch conducted electricity from the line back to the tree where Gonzales was working, resulting in his electrocution. This sequence of events was established by physical evidence, including burn marks left on the branch which came into contact with the high-voltage line and falling of the line itself after it was struck by the branch.

Although APS suggested that Gonzales violated numerous safety precautions, including use of an electric chainsaw with an extension cord, use of an aluminum ladder to climb the tree, use of a chain to brace the branch, and lack of expertise in trimming trees near electrical lines, the cause of his electrocution was the branch coming into contact with the high-voltage wire while it was still attached to the tree.

## PROCEDURAL HISTORY

A complaint was filed against APS by Gonzales' wife and children and his estate. Trial lasted nearly three weeks, during which over 30 witnesses testified and approximately 250 exhibits were utilized. The jury returned a verdict finding APS 90% negligent, Davidson 5% negligent, and Gonzales 5% comparatively negligent. The jury awarded $500,000 to Gonzales' estate, $300,000 to his wife, and $250,000 to each of the children.

## ISSUES ON APPEAL

On appeal, APS argues that (1) damages were improperly awarded to both Gonzales' estate and his survivors, (2) four categories of photographs were improperly admitted during trial, (3) the trial court erroneously failed to instruct the jury on assumption of the risk, and (4) excessive damages were awarded.

## AWARD TO ESTATE

■ The complaint filed against APS in connection with Lupe Gonzales' electrocution sought damages on behalf of the estate as well as on behalf of his wife and children. APS argues that A.R.S. § 12–612 was violated when the jury awarded damages to both Gonzales' estate and to his survivors. A.R.S. § 12–612(A) states:

> A. An action for wrongful death shall be brought by and in the name of the surviving husband or wife or personal representative of the deceased person for and on behalf of the surviving husband or wife, children or parents, *or if none of these survive*, on behalf of the decedent's estate. (Emphasis added.)

Accordingly, a decedent's estate may bring an action to recover damages only if the decedent is survived by neither spouse nor children. *Solomon v. Harman*, 107 Ariz. 426, 430, 489 P.2d 236, 240 (1971); *Katz v. Filandro*, 153 Ariz. 601, 604, 739 P.2d 822, 825 (App.1987). Had APS timely challenged the capacity of Gonzales' estate to sue, dismissal of the estate would have been appropriate. However, counsel for APS failed to raise the issue of the estate's capacity to sue.

Rule 9(a), Ariz.R.Civ.P., 16 A.R.S., states in part:

> When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, he shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge.

APS did not raise lack of capacity to sue in its answer, verified or otherwise, and did not raise it in a responsive pleading. APS did not raise the issue in a motion for summary judgment. *Compare Baxter v. Harrison*, 83 Ariz. 354, 321 P.2d 1019 (1958). Nor did APS challenge the estate's capacity to sue in the pretrial statement. APS did not even object to the jury instruction informing the jury of the right of Gonzales' estate to recover damages. APS did not raise incapacity of the estate to sue until three days after the jury's verdict was returned.

■ Lack of capacity to sue is not jurisdictional and can be waived. *Ballard v. Lawyers Title of Arizona*, 27 Ariz.App. 168, 169, 552 P.2d 455, 456 (1976). In *Salinas v. Kahn*, 2 Ariz.App. 181, 407 P.2d 120, *modified on other grounds*, 2 Ariz.App. 348, 409 P.2d 64 (1965), lack of capacity of an unmarried woman with whom the decedent was living to recover for the decedent's wrongful death was not raised by the defense until trial. This court stated:

> With full discovery being allowed to parties under modern rules of procedure, matters of this kind should be raised prior to trial....

*Id.* 2 Ariz.App. at 186, 407 P.2d at 125.[1]

In *Baxter*, the supreme court upheld the trial court's granting of defendants' motion for summary judgment alleging the incapacity of parents of a 37–year–old married

---

1. In *Salinas*, the unmarried claimant voluntarily abandoned her claim when the matter was submitted to the jury.

man to file a wrongful death action on the decedent's behalf. In so ruling, however, the supreme court stated that the defense of capacity to sue can be waived. *Id.* 83 Ariz. at 356, 321 P.2d at 1021.

■ APS has waived the defense of the capacity of Gonzales' estate to sue by failing to raise this issue until after the jury's verdict was returned. Accordingly, we reject APS's suggestion that lack of capacity to sue actually constitutes failure to state a claim. The complaint on behalf of the estate indeed states a claim, that is, the wrongful death of Gonzales. However, the estate is not the proper party to assert the claim because Gonzales was survived by a spouse and children.

Because we reject the argument of APS that A.R.S. § 12–612 bars the award of $500,000 to Gonzales' estate, we need not address APS's argument that *Wright v. Mayberry*, 158 Ariz. 387, 762 P.2d 1341 (App.1988), requires that the entire award of damages be vacated. *Wright* involved a situation in which the jury awarded a total of $65,250, but conditioned receipt of $21,250 of that sum upon completion of future knee surgery. Division One concluded that it was impossible to determine whether the jury, had it been informed that contingent awards were impermissible, would have simply reduced their award by $21,250 or decided to forego the contingency and award the unfettered sum of $65,250. Had APS made timely objection to the capacity of the estate to sue, the trial court could have deleted the estate as a party and plaintiffs' counsel could have restructured his argument so as to simply ask that the jury award economic loss damages to the surviving spouse and children rather than to the estate.

The jury's verdict closely paralleled the figures suggested by plaintiffs' counsel in closing argument:

It is my feeling that they are entitled to, at a minimum, their economic loss on this case, which I say—and I will explain to you why I put this figure even though Dr. Buehler says $400,000.00. I say it is at a minimum of $500,000.00 on the economic loss part. You then have to valu-

ate what it has been like to Rosa to lose her husband, and I guess to you the figure of $500,000.00. What is like [sic] then to put numbers on the loss of your father, and I suggest the figure of $250,-000.00 for each of the three boys, for a total of $1,750,000.00.

It is clear that the $500,000 awarded to the estate was for loss of future earnings.

### *Admissibility of Photographs*

APS next argues that reversible error occurred when the trial court admitted into evidence four categories of photographs. The four categories included (1) photographs of the alley where the electrocution occurred several months after the accident and after APS had trimmed the tree in question, (2) photographs of the alley 10 months after the accident, (3) other alleys in Coolidge showing other trees in proximity to other power lines, and (4) photographs taken two years after the accident.

The standard of review regarding the admission or rejection of evidence is abuse of discretion. *Throop v. F.E. Young and Co.*, 94 Ariz. 146, 155, 382 P.2d 560, 571 (1963); *State v. Stanley*, 156 Ariz. 492, 494, 753 P.2d 182, 184 (App.1988).

### A. *Photos of Accident Scene after APS Trimmed*

■ APS argues that photographs of the alley showing the appearance of the Espinosa elm tree after APS trimmed the tree following Gonzales' electrocution constituted impermissible evidence of remedial measures taken. Rule 407, Ariz.R.Evid. 17A A.R.S. We believe that any error in the admission of these photographs was minimized by the fact that APS offered similar photographs into evidence.

### B. *Appearance of Alley 10 Months after Accident*

APS argues that photographs of the scene were only admissible once a foundation was established indicating that the photographs fairly and accurately depicted the scene at the time that the accident occurred. *Slow Development Co. v. Coul-*

*ter,* 88 Ariz. 122, 123, 353 P.2d 890, 892 (1960).

APS offered photographs showing the area approximately four months after the accident. In addition, the pretrial statement of APS indicated that APS intended to introduce photographs showing the area 22 months after the accident.

## C. *Other Trees in Proximity to Other Power Lines*

■ Plaintiffs also offered photographs depicting other tree branches in close proximity to other APS power lines in Coolidge. During opening statement, counsel for APS told the jury:

Ladies and gentlemen, we have a simple policy, known by everyone at Arizona Public Service Company, perhaps not to plaintiff's satisfaction, but it is known. It is keep the trees out of the wires. We do not want tree branches into wires, overhead primary lines. That is an immediate hazard, and everybody is out there patrolling periodically and annually to make sure that trees are out of the wires. No one will be brought into this court room over these three weeks that we are asking you to sit here who will say anything to the contrary.

Plaintiffs argue that these photographs were admissible to rebut APS's claim of diligently patrolling for tree branches near power lines. We agree.

## D. *Photographs Two Years after Accident*

■ Finally, certain photographs were admitted showing trees in the vicinity of power lines, some of which included tree branches actually entangled in power lines. APS had repeatedly given notice to plaintiffs of its intent to prove that inspections of power lines and trees in the Coolidge area were conducted, that policies did exist regarding the trimming of trees, and that regular line patrols and inspections occurred. These photographs were relevant to rebut these claims. *Cf. Grant v. Arizona Public Service Co.,* 133 Ariz. 434, 450, 652 P.2d 507, 523 (1982).

All of the photographs were taken in the Coolidge area, a majority of them were within three blocks of the site of the accident, and every photograph showed trees or shrubs interfering with or in close proximity to APS power lines. We find no error in the admission of these photographs.

## *Assumption of the Risk*

■ APS argues that the trial court committed reversible error when it failed to instruct the jury on the defense of assumption of the risk. Article 18, § 5, of the Arizona Constitution provides in part:

Section 5. The defense of ... assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury.

The elements of assumption of the risk are (1) a risk of harm to the plaintiff caused by a condition of the defendant's property, (2) plaintiff's actual knowledge of the risk and appreciation of its magnitude, and (3) plaintiff's voluntary choice to accept the risk given the circumstances. *Hildebrand v. Minyard,* 16 Ariz.App. 583, 585, 494 P.2d 1328, 1330 (1972).

■ APS argues that Gonzales knew of the specific risk of electrocution from the high power lines. However, Gonzales was not electrocuted by virtue of directly coming into contact with the high power line. The risk presented here requires closer analysis. No evidence was presented that Gonzales was aware of the fact that should a tree branch from a tree in which he was positioned come into contact with a high power line, electricity could be conducted through the tree branch into the tree, thereby placing him at risk for electrocution. Since it is not disputed that this is precisely how Gonzales was electrocuted, it was Gonzales' knowledge of that *specific risk* which was required to be established by APS before an instruction on assumption of the risk would have been appropriate. In *Cota v. Harley Davidson, a Division of AMF, Inc.,* 141 Ariz. 7, 14, 684 P.2d 888, 895 (App.1984), this court rejected the argument that because a motorcyclist was generally aware of the danger posed by the

rupture of a motorcycle gas tank, the motorcyclist assumed the risk of rupture of a gas tank of flawed design. In so ruling, we stated:

> Defendants were not entitled to an instruction on assumption of risk. In order for the doctrine of assumption of risk to be applicable, a general knowledge of a danger is not sufficient but, rather, the plaintiff must have actual knowledge of the specific risk which injured him and appreciate its magnitude. [Citation omitted.]

*Id.*

We find no error in the trial court's refusal to instruct the jury on the defense of assumption of the risk.

### Excessive Damages

■ Finally, APS argues that the damages awarded by the jury were excessive. The standard of review for award of damages is abuse of discretion. *King v. O'Rielly Motor Co.*, 16 Ariz.App. 518, 524, 494 P.2d 718, 724 (1972). To be found excessive, damages must be unreasonable, outrageous, and beyond all measure. *Flieger v. Reeb*, 120 Ariz. 31, 35, 583 P.2d 1351, 1355 (App.1978).

■ APS argues that the jury's award was a product of passion and prejudice resulting from the previously-discussed photographs and testimony from Michelle Fletcher and Robert Pitman. Both Fletcher and Pitman lived within one block of the scene of the electrocution. Michelle Fletcher testified that in 1985, she notified APS of a tree contacting her service line. APS failed to respond to her complaint. Robert Pitman testified that he lived next door to a man named Jack Harrison who had a tall elm tree, approximately 60 to 80 feet tall, growing on his property. One or more limbs from the tree extended over an APS power line. APS failed to respond to repeated complaints about the tree limbs. Eventually, Pitman and Harrison ended up trimming the trees themselves.

■ We do not believe that this evidence, either individually or cumulatively,

resulted in an impassioned verdict by the jury. Although the Pitman incident occurred six years before the accident, this evidence was nevertheless probative. *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 499, 733 P.2d 1073, 1082, *cert. denied*, 484 U.S. 874, 108 S.Ct. 212, 98 L.Ed.2d 177 (1987). In addition, no objection was made when Pitman and Fletcher testified at trial to the above-described events.

Plaintiffs' expert testified that Gonzales' death resulted in the loss of $643,640 in future earnings. Evidence was presented that Gonzales was ambitious and intelligent, and never missed work at his job where he earned approximately $23,000 a year. Gonzales was a devoted father, who was inseparable from his children and took them swimming, fishing, and on family outings. He was married to his wife Rosa for 14 years and enjoyed an outstanding marriage. The jury's verdict was not excessive.

We affirm.

LACAGNINA, C.J., and LIVERMORE, J., concur.