NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

SHAWN WAGNER, a married man,
*Petitioner/Appellee*,

*v.*

STATE OF ARIZONA, a body politic and ARIZONA GAME AND
FISH DEPARTMENT, an agency of the State of Arizona,
*Respondents/Appellants*.

No. 1 CA-CV 13-0521

FILED 1-22-2015

Appeal from the Superior Court in Maricopa County
No.  LC2011-000683-001
The Honorable Crane McClennen, Judge

**AFFIRMED**

COUNSEL

Bihn & McDaniel, PLC, Phoenix
By Martin A. Bihn, Donna M. McDaniel
*Counsel for Petitioner/Appellee*

Arizona Attorney General's Office, Phoenix
By Dennis D. Carpenter, Jr., Kirstin A. Story
*Counsel for Respondents/Appellants*

---

## MEMORANDUM DECISION

Presiding Judge Patricia A. Orozco delivered the decision of the Court, in which Judge Randall M. Howe and Judge Maurice Portley joined.

---

**O R O Z C O**, Judge:

**¶1**        Appellants the State of Arizona and the Arizona Game and Fish Department (AzG&F or the Department) (collectively the State) appeal from the superior court's ruling that a disciplinary action against Appellee Shawn Wagner, a wildlife manager and law enforcement officer employed by the Department, violated Arizona Revised Statutes (A.R.S) section 38-532.A. (West 2015),[1] Arizona's whistleblower statute.  For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**        Shortly before sunset in September 2010, Wagner shot an elk with an arrow while bow hunting.  He and Kenny Clay III, who was also a wildlife manager with the Department, tracked the elk until darkness required them to terminate the search.  Because Wagner had to leave the hunt, Clay III and Kenny Clay Jr., a retired wildlife manager, agreed that they would continue to look for the elk the following day, and that if they found it, they would put Wagner's tag on it.[2]  All present at the hunt believed that if they found the elk, it would be dead and that Wagner would have made the fatal shot.  The next morning, Clay III, Clay Jr. and James Weeks found the elk still alive but standing in a pool of blood.  Clay III shot the elk and because they all agreed that Wagner had inflicted the mortal wound, Clay Jr. attached Wagner's tag to the elk, Clay III signed the tag, and Clay Jr. transported the elk for processing.

---

[1]        We cite the current versions of the applicable statute because no revisions material to this decision have since occurred.

[2]        Regulations preclude an individual from attaching his tag or allowing his tag to be attached to wildlife killed by someone else.  Ariz. Admin. Code R12-4-302.E.

¶3 Stories about the hunt circulated within the Department and eventually reached Leonard Ordway, the Assistant Director of Field Operations for the Department, and he raised questions as to whether any Title 17[3] violations may have occurred during the hunt. Ordway met with Department Regional Manager Jon Cooley, who thereafter asked Wagner's supervisor, Bob Birkeland, to gather facts about the hunt to determine what course of action, if any, to pursue. Cooley told Birkeland that the inquiry was not a C1.10 investigation.[4] When Birkeland asked Wagner to give a written statement about the hunt, Wagner, who had already told Birkeland about the hunt, asked if it was a formal investigation and was told it was not. Wagner refused to provide a written statement but said he would cooperate with a C1.10 investigation.

¶4 On September 29, 2010, Wagner sent a memorandum to Larry Voyles, Director of the Department. Wagner complained about the decisions of "Ordway and his chain of command" in conducting an investigation based on rumors without interviewing anyone who was on the hunt and discussing the hunt up and down the chain of command, questioning Wagner's integrity. Wagner explained that he refused to provide a written statement regarding the hunt because without a formal investigation, he would not receive the protections to which he was entitled during such an investigation.

¶5 Voyles called Wagner and told him that he agreed with the memorandum in that employees should not have been treated in that manner. Voyles initiated a formal C1.10 investigation into the conduct of those on the elk hunt and into the conduct of Ordway and Cooley in initiating the informal investigation. At Voyles' request, an outside agency, the Arizona Department of Juvenile Corrections, conducted the C1.10 investigation. Wagner was not advised of his right to a representative pursuant to A.R.S. § 38-1004.A.

¶6 Wagner inquired when the investigation would be concluded and Ordway told him, "it's your fault this is taking so long, had you not sent your e-mail [memorandum] to the director we could have been done with this two months ago." As a result of the investigation, Wagner was

---

[3] *See* A.R.S. § 17-101, *et seq.*

[4] A C1.10 investigation refers to that section of the AzG&F Operating Manual that governs the process for investigations into employee misconduct.

suspended for sixteen hours. The report found compliance by the Department with internal policies and no wrongdoing by management.

¶7 Wagner initiated the grievance process. Knowing that the first investigation had complied with neither AzG&F standards nor with A.R.S. § 38-1101, which provides protections for law enforcement officers under investigation, Voyles ordered a second investigation be conducted by another external agency, the Arizona Department of Corrections.

¶8 The second investigation, like the first, was also intended to examine Ordway and Cooley's conduct, but for unknown reasons, did not. The second investigation also resulted in a second letter of discipline sent to Wagner, dated April 22, 2011, again imposing a sixteen-hour suspension. The April 22 letter, prepared by Ordway and Cooley, among others, and signed by Voyles, included a reference to Wagner having sent his September 29 memorandum criticizing Ordway and his chain of command and explaining that he would cooperate only with a formal investigation. The letter found that Wagner had violated Arizona Administrative Code R12-4-302 by giving his hunt tag to Clay III and allowing him to use it and A.R.S. § 17-309.A.2. by possessing and transporting an elk he did not kill or tag. The letter further found that Wagner's actions constituted insubordination and willful disobedience and that he failed to comply with Department policies and directives.

¶9 Wagner again filed a grievance, alleging that the investigation violated a number of Department policies, rules and statutes, including A.R.S. § 38-532, the whistleblower statute. Voyles denied the grievance, and Wagner appealed to the Department of Administration, which upheld the suspension. Wagner also filed a "whistleblower" claim pursuant to A.R.S. § 38-532.A. After an evidentiary hearing on Wagner's whistleblower complaint, the hearing officer concluded that Wagner's September 29 memorandum was a "disclosure of information of a matter of public concern" as required for A.R.S. § 38-532.A. to apply. However, the evidence failed to show any connection between that disclosure and Wagner's suspension. Wagner's complaint was dismissed and the disciplinary action was upheld.

¶10 Wagner then filed a complaint in superior court for a trial de novo, alleging a violation of the whistleblower statute. After a two-day bench trial, the trial court found that Wagner was the subject of unlawful reprisal. The court ordered all references to the discipline be removed from Wagner's personnel file and awarded him back pay and performance incentive pay lost as a result of the suspension, attorney fees, and general

damages of $100,000. The State timely appealed. We have jurisdiction pursuant to Article 6, Section 9 of the Arizona Constitution and A.R.S. §§ 12-913, -120.21.A.1., and -2101.A.1. (West 2015).

## DISCUSSION

**¶11** When the superior court considers an administrative action, this court reviews the superior court's decision to determine whether the record contains evidence to support the judgment. *Brodsky v. Phoenix Police Dep't Ret. Sys. Bd.*, 183 Ariz. 92, 95, 900 P.2d 1228, 1231 (App. 1995).

I. Did Wagner's Memorandum Present a Matter of Public Concern?

**¶12** Under A.R.S. § 38-532.A.:

It is a prohibited personnel practice for an employee who has control over personnel actions to take reprisal against an employee for a disclosure of information of a matter of public concern by the employee to a public body that the employee reasonably believes evidences:

1. A violation of any law.

2. Mismanagement a gross waste of monies or an abuse of authority.

**¶13** The State argues that Wagner's September 29 memorandum did not constitute a "disclosure of information of a matter of public concern" under the statute. Unlawful conduct by a government employee, illegal activity in a government agency, the failure of a government agency to perform its responsibilities, or conduct that is a breach of the public trust constitute matters of public concern protected under the statute. *See Connick v. Myers*, 461 U.S. 138, 148 (1983); *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004). Individual personnel disputes irrelevant to the public's evaluation of a government agency's office are generally not of public concern. *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. We look at the plain language of the statement. *Desrochers*, 572 F.3d at 711. Whether a disclosure involves a matter of public concern is a question of law based on the facts of the individual case. *Connick*, 461 U.S. at 148 n.7; *Roe v. City & Cnty. of San Francisco*, 109 F.3d 578, 584 (9th Cir. 1997).

¶14          The State does not dispute that if the memorandum disclosed violations of the policies and procedures governing the internal investigation of officers, it would present an issue of public concern.  The State contends, however, that Wagner's memorandum does not disclose such violations, but presents only a personal grievance as to how Wagner was treated, making only a passing reference to policy violations.

¶15          Wagner's memorandum does not specifically cite any statute, regulation, or policy violation and it addresses Wagner's own personal employment dispute.  However, in explaining why he declined to provide a written statement, Wagner wrote that he had been told there was neither a criminal investigation nor an investigation into employee misconduct.  In the absence of an investigation, Wagner was "not inclined to do anything, [because he was] not being provided the protections provided to [him] in those policies and procedures."  Wagner further asserted that the investigation being conducted did not pass the "Headline Test."  The "Headline Test" was described as an internal policy to guide decision making by having personnel consider whether they would want to see their conduct on the front page of the newspaper.  These statements are the only direct references to any policy violations.  However, the memorandum viewed in its entirety, though personal in nature, clearly complains that Ordway and Ordway's chain of command, all Wagner's superiors, were engaged in an improper investigation based on rumor and gossip.  This investigation affected both Wagner and his colleagues and denied him the protections of a proper investigation.  Director Voyles demonstrated his understanding of this by discontinuing Ordway's investigation and initiating a formal C1.10 external investigation of Wagner's elk hunt as well as an investigation of Ordway's conduct.

¶16          The State argues that the fact that the memorandum was circulated internally militates against a finding that the disclosure was a matter of public concern.  The memorandum was addressed to Voyles, the Department Director, and was also sent to the Human Resources Branch Chief and the Deputy Director of the Department.  Disclosure to a limited internal audience is a factor that can weigh against finding a disclosure to be of public concern, but it is not determinative. *Thomas*, 79 F.3d at 810; *Roe*, 109 F.3d at 585.    Applying that factor in this case, however, would be inconsistent with A.R.S. § 38-532.A., which requires disclosure be made to a "public body."   The definition of "public body" includes "an agency director."   A.R.S. § 38-531.5. (West 2015).   Wagner's disclosure complied with the statute.

¶17        We find that Wagner's September 29 memorandum constituted a disclosure of the failure of government personel to follow prescribed internal investigative procedures and so disclosed a matter of public concern.

II.    Did the Superior Court Improperly Consider the Underlying Bases of the Disciplinary Action?

¶18        The superior court considered the statute and Department regulations under which Wagner was disciplined and, based on the testimony before the court, concluded that Wagner was not guilty of the violations. The State argues that the superior court exceeded its jurisdiction by reviewing the substantive basis of Wagner's suspension. Wagner argues that the court could properly consider whether a valid non-retaliatory basis existed for the discipline and that, in any event, the court's ruling on Wagner's whistleblower claim was not based on the correctness of the discipline. "We independently review the superior court's subject matter jurisdiction as an issue of law. *Glover v. Glover*, 231 Ariz. 1, 6, ¶ 18, 289 P.3d 12, 17 (App. 2012).

¶19        When Wagner filed his complaint in superior court, a disciplined employee could appeal a suspension by the personnel board to superior court only for a suspension that exceeded forty hours. A.R.S. § 41-785.A. (2011).[5]  Wagner was suspended for sixteen hours. The court therefore lacked jurisdiction to consider an appeal of Wagner's suspension.

¶20        The matter before the trial court, however, was not an appeal of Wagner's suspension, but an appeal of the denial of his whistleblower complaint. When considering whether a disciplinary action is retaliatory, the court inquires into whether the employer's proffered reason for the discipline was a pretext. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). Whether the reason is a pretext is based not on whether the reason is actually incorrect or false, but whether the employer honestly believed its reasons and acted on them in good faith at the time the discipline was imposed, even if those reasons ultimately proved to be incorrect or baseless. *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006); *Villiarimo*, 281 F.3d at 1063. A plaintiff can show that the belief was

_____

[5]    The statute was subsequently renumbered and revised to increase the minimum suspension from which an appeal may be taken to eighty hours. *See* A.R.S. § 41-783.A. (West 2015).

not honestly held by showing that the employer's explanation was weak, implausible, inconsistent, or incoherent. *Young*, 468 F.3d at 1250.

¶21 The court here went beyond an inquiry of the employer's beliefs and affirmatively declared that Wagner had not violated R12-4-302 or A.R.S. § 17-309.A.2., but the court did not base its decision that the Department had retaliated against Wagner on that finding. The court rejected the argument that Voyles imposed discipline based on his honest belief that Wagner had committed violations and instead found:

> Voyles imposed discipline on Wagner based on the letter drafted by Cooley and Ordway, the two individuals whose conduct originally led Wagner to write the September 29 memorandum to Voyles . . . it is this Court's opinion that the discipline . . . imposed on Wagner was a result of the conduct of Cooley and Ordway in conveying their version of the facts to Voyles, and in their drafting of the disciplinary letter to Wagner that Voyles ultimately signed.

Even when the court cited Wagner's non-violations to support its decision that Wagner was punished for the September 29 memorandum, the court focused on the letter drafted by Ordway and Cooley:

> Once Voyles realized at the hearing held in this matter Wagner did not violate the rules and regulations he was accused of violating, he came up with some new reasons that were never even mentioned in the letter. Such after-the-fact attempt to come up with new reasons does not change the fact that Ordway and Cooley drafted the letter in such a way that it imposed discipline on Wagner as a result of his September 29 memorandum.

¶22 The court's determination that Wagner did not violate R12-4-302 and A.R.S. § 17-309.A.2. does not constitute a decision on appeal from administrative discipline, so the court did not exceed its jurisdiction. Further, the court's finding was not the basis of the court's ruling on Wagner's whistleblower complaint and does not provide a basis for reversing the court's ruling.

III. Did the Superior Court Properly Find that Wagner's Discipline Was Caused by His Memorandum?

¶23 Causation is generally a fact question for the fact finder. *Barrett v. Harris*, 207 Ariz. 374, 378, ¶ 12, 86 P.3d 954, 948 (App. 2004). In

reviewing a trial to the court, we view the evidence in the light most favorable to the prevailing party, and we are required to affirm the trial court if there is any evidence to support the judgment. *Inch v. McPherson*, 176 Ariz. 132, 136, 859 P.2d 755, 759 (App. 1993). We defer to the trial court's determination of witness credibility. *Gutierrez v. Gutierrez*, 193 Ariz. 343, 347, ¶ 13, 972 P.2d 676, 680 (App. 1998). We do not reweigh conflicting evidence, but determine only if the record contains substantial evidence to support the trial court's decision. *In re Estate of Pouser*, 193 Ariz. 574, 579, ¶ 13, 975 P.2d 704, 709 (1999). Substantial evidence is evidence from which a reasonable person could reach the same result as the trial court. *Id.*

**¶24** The superior court stated four reasons why it determined that Wagner was punished because of his memorandum. First, when Wagner asked Ordway when the investigation would be concluded, Ordway responded, "It's your fault this is taking so long, had you not sent your [memorandum] to the director we could have been done with this two months ago." Additionally, Cooley made a similar comment when Birkeland inquired why the investigation was taking so long. From these comments, the court concluded that Ordway and Cooley were "clearly displeased" that Wagner sent the memorandum. Second, Ordway and Cooley drafted the disciplinary letter to Wagner and had a motive to draft the letter in such a way so as to appear blameless in their own conduct while finding Wagner had committed violations. Third, after Voyles admitted Wagner had not committed violations, Voyles created new reasons for the discipline not contained in the disciplinary letter. Fourth, the disciplinary letter referred to and quoted from a portion of the memorandum as a reason for the disciplinary action.

**¶25** The disciplinary letter itself presents substantial evidence supporting the court's causation finding. The disciplinary letter to Wagner imposing the sixteen-hour suspension expressly refers to Wagner's memorandum. The letter states "[t]he specific reasons for your suspension are" followed by four paragraphs describing the hunt and statements Wagner made during his interview, followed by:

> Upon learning of the fact finding that your supervisor, Bob Birkeland was asked to conduct, you sent a memo dated September 29, 2010 to Director Larry Voyles. In that memo you admonished Assistant Director Leonard Ordway and the chain-of-command for not following the C1.10 process. You stated the following in your September 29, 2010 memo:

"After the investigation was initiated, I was asked to provide a written account of my hunt. I said no. I did not think that was warranted and no other employees I knew had been asked to write an account by their supervisor of their hunt while off duty. I was later told there was not a criminal investigation nor was there an investigation into employee misconduct. I was then told there was not an investigation, but was asked to provide a verbal statement about what happened so my supervisor could provide it to Leonard Ordway at his request because he just "wants the truth." I said no. If there is not an investigation, then I am not inclined to do anything, since I am not being provided the protections provided to me in those policies and procedures."

The issue you noted was caused by actions of your immediate supervisor not the chain-of-command above him. In your memo you went on further to criticize Assistant Director Leonard Ordway and his chain-of-command for being worried about the "Headline Test" versus finding out what occurred during your elk hunt instead of relying on office rumor. This is precisely the reason for leadership asking your supervisor, Bob Birkeland, to conduct a preliminary fact finding inquiry to determine if a formal C1.10 investigation was warranted.

The letter continued with a paragraph explaining that the Department expected officers to conduct themselves in a lawful manner on and off duty and hold themselves to the same standards as the public, and asserting that Wagner could not put himself above the law or be "insubordinate to agency leadership when asked to provide pertinent information." The letter concluded by identifying the regulations and statutes Wagner was found to have violated, and explaining the grievance process.

¶26 The disciplinary letter itself identifies Wagner's challenge to the investigative process as a reason for his suspension. Voyles testified that it was not a reason and that the reference was included under "reasons" because the letter lacked headings. This explanation seems implausible. The reference to the memorandum is made as part of a chronological statement of events with no obvious position or reason for a new heading. Further, the structure of this section of the letter, beginning with the "specific reasons" and ending with the identification of the resulting violations supports that the events described within it are reasons for the described discipline. Inserting a non-reason between the "reasons"

heading and the imposed discipline resulting from those reasons would be nonsensical.

¶27　　　　The State argues that the reference to the memorandum was included to address Wagner's "misimpression" that Ordway rather than Birkeland had conducted the investigation and to address Wagner's "insubordinate refusal to provide information." The State further argues that neither of these purposes is of public concern and thus, do not fall within the whistleblower statute. The State does not explain why the alleged misimpression needed to be addressed at all in the disciplinary letter. As for the insubordination, the State appears to argue that the reference to the memorandum is offered as evidence of Wagner's failure to comply with requests for information. But Wagner's refusal to make a statement was integral to his disclosure that the Department was conducting an improper investigation and both Cooley and Ordway testified that Wagner had a right to not give a statement in the absence of a formal investigation. Even if Wagner could be properly disciplined for his failure to cooperate in the investigation he challenged, the quotation from the memorandum and the surrounding comments go beyond merely addressing that failure. The comments that Wagner had "admonished" and "criticized" Ordway and the explanation as to why the preliminary fact finding was ordered imply a criticism of Wagner for having made the complaint and a defense of the improper procedures. Its inclusion in the disciplinary letter suggests a retaliatory motive.

¶28　　　　The superior court's ruling is supported by substantial evidence and we therefore affirm the court's decision finding that Wagner was disciplined for his September 29 memorandum.

IV.　　Did the Superior Court Abuse Its Discretion In Awarding Wagner $100,000 in General Damages?

¶29　　　　An employee against whom a prohibited personnel practice is committed may recover attorney fees, costs, back pay, full reinstatement and general and special damages "for any reprisal resulting from the prohibited personnel practice." A.R.S. § 38-532.D. General damages are defined as damages that "necessarily and by implication of law result from the act or default complained of." *Palmer v. Kelly*, 54 Ariz. 466, 468, 97 P.2d 209, 209-10 (1939). Such damages may not be determined by a fixed calculation, but may be left to the reason and discretion of the fact finder. *Id.*; *Selaster v. Simmons*, 39 Ariz. 432, 441, 7 P.2d 258, 261 (1932);. We review a court's decision on damages for abuse of discretion. *Gonzales v. Ariz. Pub. Serv. Co.*, 161 Ariz. 84, 90, 775 P.2d 1148, 1154 (App. 1989). We uphold the

11

decision if reasonable evidence exists to support it. *Wolk v. Nichols*, 117 Ariz. 352, 353, 572 P.2d 1190, 1191 (1977). To be excessive, damages must be "beyond all measure, unreasonable, and outrageous[.]" *Flieger v. Reeb*, 120 Ariz. 31, 35, 583 P.2d 1351, 1535 (App. 1978). We reverse only if the amount is clearly out of reason and the result of passion and prejudice. *Selaster*, 39 Ariz. at 441, 7 P.2d at 261.

¶30　　　Wagner sought $250,000 in general damages, arguing that the experience had irreparably tarnished his reputation and caused several years of anguish. He testified that he believed being a game warden was what he was intended to do, that he prided himself on being very good at it, and that it was not just a job, but who he was. He described the accusation that he deliberately and intentionally violated the law he had committed his life to upholding as "tearing at the fabric that makes [him] up." Wagner explained that it took some time before he felt comfortable wearing the uniform to go do his job, and that for two years the matter had been all consuming, the subject of discussion by his coworkers throughout the state, and the topic of daily conversation in his home, causing his wife to be in tears day after day. Without explanation, the court found the evidence supported Wagner's claim for general damages and awarded $100,000.

¶31　　　The State argues that Wagner's claimed injuries are not directly traceable to the suspension, asserting that they arose immediately after the hunt and months before the suspension or were related to the stress of his challenge to the disciplinary action. The State contends that there is no support for the award of general damages.

¶32　　　Wagner's testimony described two years of stress, including discomfort in performing a job he loved and took great pride in, distress that he would be charged with violating laws he dedicated himself to upholding, being the subject of discussion by his co-workers, and turmoil at home. Although his distress began with the accusations prior to the suspension, it was not limited to that time. We can find no basis for concluding that these effects were not directly traceable to the suspension.

¶33　　　The State further argues that the award is disproportionate to any injury Wagner suffered. Although $100,000 is a significant award, we see no evidence that the award is the result of passion or prejudice or that it is so outrageous as to compel reversal.

V.      Attorney Fees on Appeal

**¶34**          Wagner seeks an award of attorney fees on appeal pursuant to A.R.S. § 38-532.D.  We grant his request for a reasonable amount of attorney fees upon compliance with Rule 21 of the Arizona Rules of Civil Appellate Procedure.

**CONCLUSION**

**¶35**          For the foregoing reasons, the superior court judgment is affirmed.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama