724 P.2d 1218

David J. RYAN and Helen Ryan, husband and wife, Plaintiffs/Appellants,

v.

STATE of Arizona, a body politic; John Moran, individually and as director of the Arizona Department of Corrections; John Kohl, individually and as director of the Arizona Youth Center, Defendants/Appellees.

No. 2 CA–CIV 5487.

Court of Appeals of Arizona, Division 2, Department A.

Feb. 20, 1986.

Reconsideration Denied April 1, 1986.

Review Denied Sept. 9, 1986.

Langerman, Begam, Lewis and Marks by Frank Lewis and Michael J. Dale, Phoenix, for plaintiffs/appellants.

Teilborg, Sanders & Parks, P.C. by James A. Teilborg and Robert J. Bruno, Phoenix, for defendants/appellees.

## OPINION

FERNANDEZ, Judge.

This case concerns the liability of the State of Arizona, through the Department of Corrections and the Director of the Arizona Youth Center (AYC), for the shooting of appellant David Ryan by a 17-year-old offender who had escaped from the Arizona Youth Center north of Tucson. The Ryans appeal the denial of their motion for judgment notwithstanding the verdict as well as their alternative motion for new trial. We affirm.

David Ryan was shot in the abdomen with a sawed-off shotgun fired at close range by John Robert Myers on September 30, 1975, during an armed robbery of a convenience store in Phoenix. The shooting was apparently without any provocation.[1] Ryan suffered extensive injuries and permanent damage. He and his wife sued the state, alleging that it was negligent in exercising its supervisory, custodial and recapture responsibilities over Myers. After a six-day trial, the jury found in favor of appellees.

Myers had first been committed to the Department of Corrections in 1969 when he was 11 years old and had been under its authority continuously since that time. He had been in several juvenile institutions, had been paroled several times, had had his parole revoked several times and continued to commit crimes during his periods of freedom. He had escaped five previous times from juvenile institutions, once in 1971, once in 1973 and three times in 1974. Apparently three of the escapes had been from AYC. Twice while Myers was on escape status he had committed crimes, including an assault on his parole officer who had attempted to apprehend him. The Ryans produced evidence that Myers had committed two armed robberies of convenience stores in early 1974. There was no indication in the record as to the nature of the weapon used. In both robberies, Myers acted with other persons.

In addition to the assault on his parole officer (the officer's lip was cut open, and he was struck on the ear and kicked in the leg), the Ryans showed that Myers had struck another juvenile in the mouth while he was confined to another juvenile institution, had struck a juvenile during his last stay at AYC, and had stabbed his brother three times and critically injured him in May 1975 while he was on parole. Myers' parole was revoked on other grounds in June 1975 and he was returned to AYC.

AYC had instituted a treatment program, known as the Intensive Program Unit (IPU), for older, more sophisticated juveniles beginning in late 1973. The behavior modification program had a series of four levels that were increasingly less structured. Juveniles in the IPU were kept in a locked cottage with a fence surrounding it. Points were earned by the juveniles in order to move from level one to levels two and three. At levels three and four, juveniles were permitted access to the rest of the institution under different degrees of watchfulness by the corrections officers. Those in level three began developing specific goals for their lives after release and by level four their plans were formulated and ready to be put into action. Since the Department of Corrections could confine juveniles at that time only until they turned 21, the aim of the program was to place the juveniles in halfway houses in the community after they had developed increased responsibility for themselves and others during their stay at the IPU. Many of the juveniles in the IPU had been at other juvenile institutions and had previously been paroled unsuccessfully. Myers had

---

**1.** Further details of the shooting appear in *State v. Myers,* 117 Ariz. 79, 570 P.2d 1252 (1977), cert. denied, 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed. 524 (1978).

been through the IPU program once before in 1974.

Myers escaped again from AYC on September 13, 1975, along with two other youth offenders. He was at level four at the time, and a halfway house in Tucson had just recently agreed to accept him after he finished the program. Six to eight juveniles were playing touch football on the grounds with a correctional service officer, the only officer on the grounds that day. A level three juvenile, Harper, was visiting with his parents on the grounds near the parking lot. Harper had been given their car keys so he could listen to the radio in the car. Myers, Harper and a third juvenile then jumped into the car and drove off. Myers testified in a deposition that was read to the jury that he had escaped because he had found a letter in the administration office addressed to him which notified him of a hearing to be held September 18. The hearing was for the purpose of determining whether he should be tried as an adult for stabbing his brother. No one was able to determine from the Department of Corrections file when AYC received notice of the transfer hearing.

The evidence showed there were 431 escapes from AYC in 1974–1975, 73 of which were from the IPU. The intensive program unit was designed to hold 32 juveniles but apparently usually housed about 20. It took approximately 90 days for offenders to work through the four levels to community placement, so roughly 160 juveniles passed through the unit in 1974–1975.

### Denial of Motion for Judgment N.O.V.

Appellants contend that the trial court should have granted their motion for a directed verdict or, alternatively, their motion for judgment notwithstanding the verdict because reasonable minds could not differ as to the state's liability under the Restatement (Second) of Torts § 319 (1965).[2] The Ryans argue that they presented overwhelming evidence to sup-

port each of the three elements of § 319. We disagree. Section 319 reads as follows:

"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

Although there is no question that the State of Arizona "took charge" of John Myers when he was first committed to the Department of Corrections in 1969 and continued to be in charge of him thereafter, the other two elements were not unquestionably established.

▇ Appellants contend that appellees' witnesses all conceded that John Myers was likely to cause bodily harm to others if he escaped again. That, however, was not their testimony. John Kohl, the director of AYC at the time, stated that Myers was "capable of violent acts" and that "the potential exist[ed]" for him to commit violent acts in the future. Kelly Spencer, the supervisor of the IPU at the time Myers escaped, also agreed Myers was capable of violence and that the potential for violence was there. In addition he stated that in September 1975 the possibility for violent crimes existed if Myers was not in a structured setting. The other corrections officers who testified either did not remember Myers or remembered him only as "obstinate," "defiant," "angry," "manipulative" and "streetwise," none of which is the same as likely to cause bodily harm to others. A statement that someone is "capable" of violence and that the "potential" exists for someone to be violent is not nearly the same as a statement that one is *likely* to cause bodily harm to another. "Likely to" means more probably than not, whereas "potential for" indicates only that the possibility exists. The Ryans' expert testified Myers was likely to cause bodily harm to others. The state's expert agreed there was a reasonable chance that Myers was likely to do harm to others if he were

---

**2.** Section 319 was the applicable negligence standard in accordance with the Arizona Su-

preme Court's earlier decision in this case. See *Ryan v. State*, 134 Ariz. 308, 656 P.2d 597 (1982).

not in a structured setting. Since the guards who dealt with Myers on a daily basis did not believe he was *likely* to cause harm, the evidence presented to the jury was thus of the type upon which reasonable minds could differ.

■ A judgment notwithstanding the verdict is proper only when there is neither evidence nor reasonable inferences which can be drawn from that evidence which would support the jury's verdict. *Huggins v. Deinhard,* 127 Ariz. 358, 621 P.2d 45 (App.1980). As we have indicated, that was not the case here. We are bound in our review to look at the evidence in a light most favorable to upholding the verdict. *Tucson Title Insurance Co. v. D'Ascoli,* 94 Ariz. 230, 383 P.2d 119 (1963). We find no error in the trial court's submission of the case to the jury. Sufficient evidence was presented by both sides so that fact issues existed for the jury to determine.

■ Appellants have focused a portion of their arguments on the fact that the appellees knew or should have known that Myers was an escape risk. There was substantial evidence that this was true. The fact that he was likely to escape, however, does not serve as proof that he was likely to cause bodily harm to others.

■ Appellants have also argued at length about the third element of § 319 of the Restatement. In view of our preceding conclusion, we need not discuss that issue in great detail. We note, however, that we also hold that it was proper to submit the case to the jury with regard to that element. We believe reasonable minds could differ as to such issues as the propriety of maintaining the intensive program unit with its four levels of increasing freedom in light of the age limit of 21 years on the department's authority over juveniles, whether or not AYC had received notice of Myers' September 18 transfer hearing, and whether or not it should have taken appropriate action to confine him at that time.

### Denial of Admission That Myers Was Dangerous

Appellants raised several issues in their motion for new trial with regard to the court's rejection of evidence. Appellants sought at various times during the trial to show that, when the county attorney filed a petition to transfer Myers to be tried as an adult pursuant to Rule 12, Rules of Procedure for the Juvenile Court, 17A A.R.S., he acted on behalf of the State of Arizona and that under Rule § 801(d)(2)(D), Rules of Evidence, 17A A.R.S. (1985 Supp.), the filing was an admission of an authorized agent of the state that Myers was not amenable to treatment or rehabilitation in the juvenile system and that the safety or interests of the public required his transfer for criminal prosecution as an adult. The court ruled that the filing of the transfer petition was not an admission against the Arizona Department of Corrections.

■ We note initially that, although appellants were not permitted to introduce the juvenile court file into evidence, they did obtain testimony from John Kohl to the effect that the transfer petition was filed and that the allegations in such petitions are that the juvenile is a danger to society and is not amenable to treatment as a juvenile. Since that evidence was apparently the only reason they sought the juvenile court file, appellants were not harmed by the court's ruling on their motion to produce the juvenile file. The rest of the file was not relevant to the issues in this case.

■ We also find that the trial court correctly ruled the filing of the petition did not serve as a binding admission upon the state. Since appellants' theory of negligence was that the Department of Corrections had not properly carried out its custodial duties with regard to Myers, the independent action of the county attorney in filing a transfer petition pursuant to Rule 12 of the Juvenile Court Rules could not serve as a binding admission upon the Department of Corrections. This is especially so since a determination of whether to try a juvenile as an adult is made by a juvenile

court judge. The jury heard testimony that the petition had been filed, that the petition alleged Myers was a danger to society and was not amenable to treatment as a juvenile, and that the reason the petition had been filed was that Myers had stabbed his brother and critically injured him. Appellants thus had the opportunity to make arguments on that evidence. We find no error in the ruling.

### Evidence on Juvenile Justice System

Appellants also complain that the state was permitted to cross-examine appellants' expert on the role of the county attorney, the juvenile probation officer, the court and the Department of Corrections in the juvenile transfer process despite the trial court's refusal to permit appellants to show that the county attorney acts on behalf of the state in filing the transfer petition. They contend that this permitted the state to use the court's ruling as a weapon as well as a shield by shifting responsibility for Myers' actions to immune officials. Additionally, they dispute the court's refusal to permit them to call two experts to testify on the juvenile court system.

■ The record shows that, during appellees' cross-examination of the Ryans' expert, some questions were asked about referrals in the juvenile system and the role of the intake officer and juvenile judge in the usual handling of referrals. No mention was made of the county attorney's role, and there was only a brief mention of the Department of Corrections role.

We find that the questions were asked in connection with documents from the Department of Corrections file which were admitted into evidence and were asked in response to earlier questions appellants had asked about transfer petitions. Appellants also mentioned the referral process and juvenile court system in their opening statement and closing argument.

The trial court ruled that appellants could call two experts to testify on the juvenile system. However, the court ruled that they could not testify that the county attorney acts on behalf of the state in filing a transfer petition. Since appellants wanted to call them solely to testify on that point, the court refused to permit them to testify. In view of our previous discussion on that issue, we find that the trial court was correct in refusing permission.

■ Appellees have attempted to raise an assignment of error in the trial court's denial of their motion for directed verdict. Since the issue was not made the subject of a cross-appeal, we cannot consider it. See *Maricopa County v. Corporation Commission of Arizona*, 79 Ariz. 307, 289 P.2d 183 (1955); *Aegerter v. Duncan*, 7 Ariz. App. 239, 437 P.2d 991 (1968).

We note that the supreme court in the prior appeal of this matter found that appellants were entitled to try their negligence action to a jury. We believe the matter was fairly tried, and the jury has now spoken. Having found no error in the court's denial of the motions for judgment notwithstanding the verdict and for new trial and in the rulings during the course of the trial, we affirm the judgment for appellees.

HOWARD, P.J., and BIRDSALL, J., concur.