933 P.2d 1251

Luella HUTCHERSON and Alma L. Usher, Plaintiffs–Appellees, Cross–Appellants,

v.

CITY OF PHOENIX, a municipal corporation, Defendant–Appellant, Cross–Appellee.

1 CA–CV 94–0202.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 8, 1996.

Review Granted in Part and Denied in Part March 25, 1997.*

---

\* Jones, V.C.J., of the Supreme Court, voted to grant the Petition for Review of the City of Phoe-

nix as to Issue 1.

Treon, Strick, Lucia & Aguirre by Richard T. Treon and Arthur G. Newman, Jr., Phoenix, for Plaintiffs–Appellees, Cross–Appellants.

Jones, Skelton & Hochuli by Georgia A. Staton, Eileen J. Dennis and Kathleen Wieneke, Phoenix, for Defendant–Appellant, Cross–Appellee.

## OPINION

NOYES, Judge.

On February 24, 1990, Chiquita Burt called a City of Phoenix 911 operator and, initially, said that "someone just keeps harassing me" and he was threatening to do something to the car of her boyfriend, Darryl Usher. After further conversation, the 911 operator took Usher's address and said, "[W]e'll send an officer out there." About eighteen minutes later, Burt's ex-boyfriend, Craig Gardner, broke into Usher's apartment and shot and killed Usher, Burt, and himself. The victims' mothers filed wrongful death actions against the City, claiming that the 911 operator mishandled the call and that, but for this fault, police would have arrived at Usher's apartment in time to prevent the murders. The City denied that the 911 operator was at fault and claimed that all fault was Gardner's.

After a three-week trial, the jury awarded $600,000 to Plaintiff Hutcherson for the loss of her daughter and $1,100,000 to Plaintiff Usher for the loss of her son. The jury found the City seventy-five percent at fault and Gardner twenty-five percent at fault. After denying post-trial motions, the court multiplied the damages verdicts by the percentage of fault assigned to the City and entered judgments against the City in the amount of $450,000 for Plaintiff Hutcherson and $825,000 for Plaintiff Usher.

The City's appeal argues error in all elements of the case. Plaintiffs' cross-appeal

argues error in assigning any fault to Gardner. We have jurisdiction pursuant to A.R.S. section 12–2101(B) and (F)(1) (1994).

We affirm the liability and damages verdicts. Pursuant to Rule 59(a)(8), Arizona Rules of Civil Procedure ("Rule"), we reverse and remand for new trial on apportionment of fault. The evidence does not justify a verdict that the 911 operator was three times as much at fault for the wrongful deaths of Plaintiffs' decedents as Gardner, who intentionally shot and killed Plaintiffs' decedents.

### The 911 Call

An appellate court must view the facts in the light most favorable to sustaining the verdict and judgment. *McFarlin v. Hall*, 127 Ariz. 220, 224, 619 P.2d 729, 733 (1980). Because the litigation focused in microscopic detail on a four-and-a-half minute telephone conversation, we set forth a transcript of that tape-recorded call. The City's 911 calls are numbered in the order received. Burt's call on February 24 was number 106,572, meaning that the City's 911 operators handled about 1,940 calls a day in the first fifty-five days of 1990. We have heard the tape of Burt's 911 call; all voices on it sound relatively calm and controlled.

Operator (O):

This is 911. What is your emergency.

Chiquita Burt (C):

Um yes. I'm calling because someone just keeps harassing me and last night I got a restraining order on him and I can't get it through until Monday. So I was calling to see, what can I, what kind of process can I go through because he's threatening to do something to my boyfriend's car.

O: Okay. Hold on, let me take you off the emergency line first.

C: Okay. Thanks.

O: How are you being harassed?

C: Um, last night he tried to assault me and then he was threatening my family and me, telling me that he was going to kill us, and stuff like that, and um I had two guys that helped me out of the club because he tried to do something to me. And then so last night, I went to Tempe; and then I called the um Phoenix Police Department and we met 'em and we told them what happened, and so the police officer said that he would take all the information and that he would put it through and to let every—you know, I guess to let the police, ya know, the other polices know that I did file a complaint towards this guy.

O: Uh huh.

C: And so now today he got the number to where my boyfriend lives and he's trying 'ta um, he just called over here and pretended like he was somebody else to see if I was here, and then he's threatening to walk around the apartments until he finds his car, and he's gonna do something to his car, so I don't know, could you have somebody go over there to his house, or something?

O: Is he an ex-boyfriend or something?

C: Yeah, he is. And um, my boyfriend said if he comes over here, he's gonna shoot him. 'Cause he's been doing this all night. And then last night he went to my girlfriend's house about twice, one at three in the morning and one at five in the morning.

O: Okay.

C: So either you can bring the police over here and I'll go to his house with the police or—

O: Well, do you have a restraining order that has to be served or you don't got one now?

C: I was, I was in the process of the restraining order last night, and the um cop I talked to, he says that it wouldn't go through until, ah, 'till Monday.

O: Well, you, you have to go to the justice of the peace court or to 'tha municipal court to get one. The officers can't give you one.

C: Okay, right, that's what he said. He gave me all the information, but I'm talk-

ing about, about right now. What can I do?

O: Where does he live? Nearby or something?

C: Yeah, he lives close.

O: Well, how close is close to where you're at now?

C: I'm, like five minutes, not even five minutes away.

O: Well, where are you calling from?

C: Phoenix.

O: Where?

C: Off of 52nd Street and Van Buren. At the ah, what's the name of the apartments, Darryl? Ciera Del, Del Rey Apartments.

O: And where does he live, though?

C: He lives off 52nd Street in the Boulder Creek Apartments, not that far from here. And he just called here and hung up. Pretended like he was someone else.

O: Did he say he was coming over?

C: Yeah.

O: Well, we can have an officer come out there and take some information. If he happens to show up, though, before an officer gets there, you need to call us right away, okay, and tell us he's there now. What is the actual address you're at?

[Dialogue about addresses and phone numbers omitted.]

C: [Darryl's] gonna run and check the apartment number. Oh, ok. Because he just moved here so he's going to check to see what they're called.

O: Okay.

C: He plays football and I don't want him to get in trouble or anything, but he's gonna, if the guy comes over here, you know 'cause he has been, he's been threatening me all night, you know, that's why I came over here, because he went to my girlfriend's house twice in a row looking for me, you know, and I'm—I'm just trying to prevent somebody from getting hurt.

O: Okay, he lives on 52nd Street and what?

C: Van Buren too, but he lives off 915 North 52nd Street. Darryl Usher: (From background) Apartment "O".

C: It's Apartment "O"—Building "O".

O: Okay, well, we'll send an officer out there, um like I said, if he happens to show up at the apartment before the officers first do, just call us back right away, okay?

C: All right.

O: Bye.

C: Okay, thanks.

## Duty

Prior to trial, the City moved for summary judgment on grounds that it owed no duty to Burt and Usher. The trial court denied the motion. The City's claim of error is based on out-of-state cases holding that the relationship created by a 911 call does not impose a duty of care on the agency receiving the call. *See, e.g., Wanzer v. District of Columbia,* 580 A.2d 127, 131–32 (D.C.1990); *Galuszynski v. City of Chicago,* 131 Ill.App.3d 505, 86 Ill. Dec. 581, 583, 475 N.E.2d 960, 962 (1985); *Lewis v. City of Indianapolis,* 554 N.E.2d 13, 16 (Ind.App.1990); *Allen v. Anderson,* 490 N.W.2d 848, 856 (Iowa App.1992). The City's cases all turn on recognizing a public-private/general-specific duty distinction. Arizona adopted this doctrine in *Massengill v. Yuma County,* 104 Ariz. 518, 523, 456 P.2d 376, 381 (1969), but abandoned it in *Ryan v. State,* 134 Ariz. 308, 310, 656 P.2d 597, 599 (1982) ("[W]e conclude that the doctrine in *Massengill* should be abandoned and that case is overruled.").

■ The doctrine articulated in *Ryan* was that "the parameters of duty owed by the state will ordinarily be coextensive with those owed by others." *Id.* Because *Ryan* is the law in Arizona, we do not discuss the out-of-state cases cited by the City, except for *Maple v. City of Omaha,* 222 Neb. 293, 384 N.W.2d 254 (1986), which stated that "we are persuaded by the reasoning of the Arizona court in *Ryan.*" *Id.* 384 N.W.2d at 260. In

*Maple,* a motorcyclist sued the city after being hit by a police vehicle responding to a high-priority dispatch. *Id.* at 257. The *Maple* court found "no credible evidence in this record that the 911 dispatchers, or others, acted improperly or imprudently in dispatching [the officer] on an emergency basis." *Id.* 384 N.W.2d at 261. As in this case, the city in *Maple* had a duty. *See id.* at 260. Unlike this case, however, the trier of fact in *Maple* found that the city did not breach its duty. *Id.* at 261.

The City also relies on *Morton v. Maricopa County,* 177 Ariz. 147, 865 P.2d 808 (App. 1993), a Division Two opinion which held that a county had no duty to an unidentified decedent's survivors because:

> The state's interest in identifying human remains is primarily to foster public safety through the investigation of suspected homicides. The identification of remains, of course, incidentally benefits friends and relatives. Because this is not the primary purpose, however, no relationship is created which would give rise to a duty to the Mortons.

*Id.* at 151, 865 P.2d at 812. We respectfully, but summarily, conclude that *Morton* cannot and does not revive the *Massengill* doctrine after *Ryan's* express abandonment of that doctrine.

*Ryan* was explained and followed in *Austin v. City of Scottsdale,* 140 Ariz. 579, 684 P.2d 151 (1984). In *Austin,* a police dispatcher received an anonymous call advising that Austin's life might be in danger. *Id.* at 579–80, 684 P.2d at 151–52. The dispatcher took no action, Austin was murdered, his survivors sued, and the trial court held that the city owed no duty to Austin. *Id.* at 581, 684 P.2d at 153. In reversing and remanding, the supreme court held that, by providing police protection, the city owed a duty to Austin. *Id.* at 581–82, 684 P.2d at 153–54. The court also held that a jury could find that the city had breached its duty by not doing more than it did. *Id.* at 582, 684 P.2d at 154; *see also Newman v. Maricopa County,* 167 Ariz. 501, 503–05, 808 P.2d 1253,

1255–57 (App.1991) (in investigating hidden danger on private land, sheriff had a duty to others who might go on the land).

Ryan and *Austin* are on point and controlling: by providing a 911 service, the City assumed a duty of care to those it served.

### Standard of Care

The City argues that the trial court erred by instructing the jury that the City should be held to a negligence, rather than a gross negligence, standard of care. Here, again, the City asks us to ignore advice in *Ryan* and *Austin* that the appropriate standard of care in cases such as this is negligence. *See Austin,* 140 Ariz. at 581–82, 684 P.2d at 153–54; *Ryan,* 134 Ariz. at 311, 656 P.2d at 600. The City argues that *Ryan* and *Austin* are only about duty, but we also find them instructive on standard of care.

*Ryan* declared that, generally, "the state and its agents will be subject to the same tort law as private citizens." *Ryan,* 134 Ariz. at 311, 656 P.2d at 600. Private citizens are generally held to a negligence standard of care. The *Ryan* court noted that qualified immunity—a gross negligence standard of care—was the exception, not the rule. *Id.* at 309, 656 P.2d at 598 (citing *Stone v. Arizona Highway Comm'n,* 93 Ariz. 384, 392, 381 P.2d 107, 112 (1963)). "[T]he right to sue the state is not a statutory grant, as is the case in several other states; rather, it is a common law rule in Arizona that the government is liable for its tortious conduct and immunity is the exception." *Pritchard v. State,* 163 Ariz. 427, 431, 788 P.2d 1178, 1182 (1990).

*Ryan* found that the legislature has "recognized that the state is liable for the negligent acts of its agents." *Ryan,* 134 Ariz. at 310, 656 P.2d at 599. On remand, *Ryan* was tried on a negligence standard of care, and the resulting defense verdict was affirmed on appeal. *Ryan v. State,* 150 Ariz. 549, 554, 724 P.2d 1218, 1223 (App.1986). *Austin* stated that "[u]nder *Ryan,* therefore, the City of Scottsdale, having opted to provide police

protection, had a duty to act as would a reasonably careful and prudent police department in the same circumstances." *Austin,* 140 Ariz. at 581–82; 684 P.2d at 153–54. This is a negligence standard of care.

■ The legislature has not granted qualified immunity for 911 service. In 1984 the legislature enacted A.R.S. sections 12–820 to –826 (1992 & Supp.1995) regarding liability and immunity of public entities and public employees for tortious conduct. 1984 Ariz. Sess.Laws 1091, 1092–93. The statute which grants qualified immunity for acts of public employees is A.R.S. section 12–820.02 (Supp. 1995). This statute does not grant qualified immunity to 911 operators, but it does, for example, grant it to public employees accused of "[t]he failure to make an arrest or the failure to retain an arrested person in custody." A.R.S. § 12–820.02(A)(1). Failure to make an arrest includes "failure to make an investigatory stop which may or may not lead to an arrest." *Walls v. Arizona Dep't of Public Safety,* 170 Ariz. 591, 595, 826 P.2d 1217, 1221 (App.1991). Thus, under the current statute, the City has qualified immunity if plaintiff is harmed *after* police arrive and they fail to make an arrest or an investigatory stop of the suspect; but the City does not have qualified immunity if plaintiff is harmed *before* police arrive, but after the City has received a 911 call about the suspect. We take no position on what the law should be; we only note that there is nothing in the current immunity statute covering 911 service.

The City's standard of care argument is based mainly on *Landeros v. City of Tucson,* 171 Ariz. 474, 831 P.2d 850 (App.1992), a Division Two opinion with a paragraph of dictum the City construes as rejecting the negligence standard of care for investigation of crime. *See id.* at 475, 831 P.2d at 851. *Landeros* states that " 'to assure continued vigorous police work, those charged with that duty should not be liable for mere negligence.' " *Id.* (quoting *Smith v. Iowa,* 324 N.W.2d 299, 301 (Iowa 1982)). In *Ryan,* however, the supreme court recognized well-established Arizona public policy that " 'public officers and employees shall be held accountable for their negligent acts in the performance of their official duties.' " *Ryan,* 134 Ariz. at 309, 656 P.2d at 598 (quoting *Ruth v. Rhodes,* 66 Ariz. 129, 133, 185 P.2d 304, 307 (1947)). The gross negligence paragraph in *Landeros* is dictum because the court stated that it found no evidence that defendant was negligent; thus, the court did not need to reach the gross negligence issue to decide the case. *See Landeros,* 171 Ariz. at 475–76, 831 P.2d at 851–52.

We respectfully conclude that the *Landeros* dictum must yield to *Ryan* and *Austin* on standard of care.

## Negligence

■ The 911 operator, who had three years of on-the-job experience, gave a "Priority 3" classification to Burt's call, meaning that it was a "crime not in progress." In February 1990 the average Phoenix Police Department response time for Priority 3 calls was 32.6 minutes. Plaintiffs contended through expert testimony and argument that the operator was negligent in various respects, including her failure to designate the call Priority 1 or Priority 2. Priority 2 calls were "urgent," and had an average response time of 13.6 minutes. Priority 1 calls were "serious crimes with immediate personal danger or harm," and had an average response time of 4.4 minutes. The City contended through expert testimony and argument that the operator was not negligent. It was a close question. We affirm the finding of negligence because, when the evidence is viewed in a light most favorable to sustaining that finding, it does so. *McFarlin,* 127 Ariz. at 224, 619 P.2d at 733.

## Causation

■ The City moved for a directed verdict on grounds that Plaintiffs failed to prove that the City's negligence caused the deaths of Burt and Usher. The trial court denied the motion. The element of causation is well-explained as follows:

Arizona law holds that cause-in-fact exists if the defendant's act helped cause the final result and if that result would not have happened without the defendant's act. Defendant's act need not have been a "large" or "abundant" cause of the final result; there is liability if the result would not have occurred but for defendant's conduct, even if that conduct contributed "only a little" to plaintiff's injuries.

*Ontiveros v. Borak*, 136 Ariz. 500, 505, 667 P.2d 200, 205 (1983) (citations omitted).

Plaintiffs' expert testified that, in his opinion, Burt's call should have been classified as Priority 1. He further testified that on a Priority 1 or Priority 2 call of this kind, police approach the scene using lights and sirens to scare away the suspect. He testified that a number of Phoenix police officers were in the area and available to take a Priority 1 call, as evidenced by the fact that the response time on the Priority 1 call after Burt and Usher were shot was six minutes ten seconds.

■ During the 911 call, Banda said to Burt: "Well, we can have an officer come out there and take some information. If [Gardner] happens to show up, though, before an officer gets there, you need to call us right away, okay, and tell us he's there now." This statement provided Plaintiffs with an argument that the 911 operator induced the victims to stay in the apartment rather than leave, even though the 911 operator knew that Gardner might get there before police did. *Cf. Robertson v. Sixpence Inns of America, Inc.*, 163 Ariz. 539, 546, 789 P.2d 1040, 1047 (1990) (reasonable persons could conclude that, if officer had been warned of recent armed robbery in area, he would have been more careful in approaching the trespasser who shot and killed him).

Viewed in a light most favorable to supporting the jury's finding that the 911 operator's negligence was a cause of the wrongful deaths of Burt and Usher, the evidence does so.

### Pre–911 Evidence

■ The City moved in limine to exclude evidence of events prior to the 911 call. The City argued that it could only be judged on the contents of the call and on whether the 911 operator properly prioritized the call. The trial court denied the motion and the jury heard testimony that, at about 2:00 a.m. on the day of the 911 call, Gardner approached Burt in a nightclub and said, "I'm going to kill you for breaking up with me." There was a scene, and Burt called police. Officer Bruha, who met with Burt at 3:10 a.m., testified that, in his opinion, "there was a crime of threat ongoing," and that Burt was in fear for her life. The officer told Burt to get an order of protection, to not go home, and to go someplace where Gardner could not find her. Burt went to Usher's apartment. A few hours later, she called 911.

The City contends that the pre–911 evidence was unduly prejudicial because it allowed Plaintiffs to find the 911 operator negligent based on information she never received. We see the City's point, but Plaintiffs showed the trial court arguable relevance to the pre–911 evidence. One of Plaintiffs' negligence theories was that a reasonable 911 operator would have heard enough from Burt to know to ask her about Gardner's threats the previous night; and, the argument goes, if those questions had been asked, the 911 operator would have learned that Burt feared for her life and would have given the call a higher priority. Plaintiffs' expert testified that the standard of care required the operator to ask Burt if she was in fear for her safety. We conclude that admission or preclusion of the pre–911 evidence was within the range of trial court discretion.

### Usher's Future Income

■ Darryl Usher was a wide receiver for the Phoenix Cardinals and at the time of his death he was a Plan B free agent and involved in salary negotiations with two other teams. Usher was represented in these negotiations by W.C. Benton, an agent who had represented a number of NFL players over the years. Benton had a Ph.D. in Business Administration and two Masters degrees, he was a tenured college professor, and he

headed a company that did research analysis and published data on NFL players and kept track of the salaries of NFL players.

Over the City's objection, the trial court allowed Benton to testify that Usher had been in recent contact with teams in Houston and Detroit and that, in Benton's opinion, "to a reasonable degree of probability," Usher would have gotten "at least $240,000 base pay" in 1990. Benton went on to say that he had had discussions about Usher with Houston's Director of Player Personnel, and "I think the whole deal ended up being something like 1.3 million dollars over three years, the second year being three or something, and then the third one graduating." In light of Benton's expertise, his personal knowledge of Usher, and his personal involvement in Usher's contract negotiations, we find admission or preclusion of his opinions within the range of trial court discretion.

■ The City also argues that Usher's future income was irrelevant. The court instructed the jury that it could compensate for "the income and services that have already been lost to Alma Usher as a result of [Usher's] death and that were reasonably probable to be lost in the future." Plaintiff proved, without contradiction, that Usher had a very close relationship with his mother and had told many people that he intended to buy her a house and provide for her financial security. He regularly gave his mother at least $1,000 a month and paid her utilities and insurance. Darryl Usher's future income was not irrelevant to his mother's damages.

### The Killer's Fault

■ Arizona's comparative fault scheme holds a defendant liable "only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault." A.R.S. § 12–2506(A) (Supp. 1995). Fault is defined as

an actionable breach of legal duty, act or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence in all of its degrees, contributory negligence, assumption of risk, strict liability, breach of express or implied warranty of a product, products liability and misuse, modification or abuse of a product.

A.R.S. § 12–2506(F)(2). Plaintiffs argue that no fault can be apportioned to Gardner because "fault," as defined by A.R.S. section 12–2506(F)(2), does not expressly include intentional wrongdoing. Plaintiffs also argue that a defendant who has breached a duty to protect another from criminal conduct should be prohibited from seeking to apportion fault to the criminal.

We recently addressed a similar argument in *Natseway v. City of Tempe,* 184 Ariz. 374, 376, 909 P.2d 441, 443 (App.1995). There, plaintiffs sued the cities of Mesa and Tempe for negligently failing to protect their daughter from being hit and killed by a criminal who was driving at high speed to escape police. *Id.* at 375, 909 P.2d at 442. The jury apportioned seven percent of the fault to each city, three percent to each of two police officers, and eighty percent to the criminal. *Id.* at 376, 909 P.2d at 443. Plaintiffs appealed, arguing that no fault could be apportioned to the criminal. We affirmed, holding that Arizona's comparative fault scheme requires that fault be apportioned among *all persons* who contribute to the harm, and that each tortfeasor be responsible for his or her percentage of fault *and no more. Id.; see also* A.R.S. section 12–2506(B).

Given the broad definition of fault in section 12–2506(F)(2), and the clear directive in section 12–2506(B) to compare *all* fault, we conclude that the Arizona comparative fault statutes should be interpreted as requiring comparison of all types of fault, including intentional wrongdoing. A recent case from Division Two reaches the same conclusion. In *Thomas v. First Interstate Bank,* 187 Ariz. 488, 930 P.2d 1002 (App.1996) a private security guard was shot and killed by an individual who was trying to rob an automatic teller customer at gunpoint. *Id.* Division Two concluded, as we do, that fault must be

apportioned between all wrongdoers, including one who commits a criminal act. *Id.*

We interpret a statute to give effect to legislative intent. *State v. Korzep,* 165 Ariz. 490, 493, 799 P.2d 831, 834 (1990). We look to the statute's "spirit and purpose" as well as the policy behind the statute. *Id.* The clear policy behind the comparative fault statute is that each party is responsible only for its proportionate share of the fault. *Thomas,* 187 Ariz. at 489–490, 930 P.2d at 1003–04; *Dietz v. General Elec. Co.,* 169 Ariz. 505, 510, 821 P.2d 166, 171 (1991).

The California comparative fault statute is comparable to Arizona's and has been interpreted as providing for comparison of all types of fault. *See Weidenfeller v. Star and Garter,* 1 Cal.App.4th 1, 2 Cal.Rptr.2d 14, 16 (App.1991) ("[T]he purpose of section 1431.2 is to prevent the unfairness of requiring a tortfeasor who is only minimally culpable *as compared to the other parties* to bear all the damages."); *see also Martin v. United States,* 984 F.2d 1033, 1039–40 (9th Cir.1993) (approving *Weidenfeller* and holding that fault of person who abducted child was to be compared to fault of day care center which allowed child to be abducted); *Scott v. County of Los Angeles,* 27 Cal.App.4th 125, 32 Cal.Rptr.2d 643, 657 (App.1994) (reaffirming *Weidenfeller* ); *Barth v. Coleman,* 118 N.M. 1, 878 P.2d 319, 322 (1994) (holding that negligence of bar owner and manager must be compared to intentional conduct of person who assaulted plaintiff).

The Plaintiffs in *Natseway,* and here, relied on cases standing for the proposition that "[i]n Kansas, comparative fault does not apply if one of several defendants acts intentionally." *Natseway,* 184 Ariz. at 377, 909 P.2d at 444 (citing *Lynn v. Taylor,* 7 Kan. App.2d 369, 642 P.2d 131, 135–36 (1982)). We distinguish the Kansas cases on statutory construction grounds. The Kansas comparative negligence statute does not define which fault is to be compared. *See* Kan.Stat.Ann. § 60–258a (1994). The Kansas courts have interpreted that statute as not requiring the comparison of negligence with intentional wrongdoing. *Gould v. Taco Bell,* 239 Kan. 564, 571, 722 P.2d 511, 517 (1986); *M. Bruenger & Co. v. Dodge City Truck Stop, Inc.,* 234 Kan. 682, 675 P.2d 864, 869 (1984). The Arizona comparative fault scheme does not lend itself to that interpretation.

A.R.S. section 12–2506(F)(2) defines fault to include any "actionable breach of legal duty, act or omission" which causes or contributes to the injury or damages. It is an understatement to say that Gardner's intentional shooting of Plaintiffs' decedents involved an actionable breach of legal duty which caused or contributed to their injuries. If the legislature intended to exclude intentional wrongdoing from the definition of fault, it would have expressly done so, as it did in A.R.S. section 12–2505(A) (Supp.1995), which provides that "[t]here is no right to comparative negligence in favor of any claimant who has intentionally, wilfully or wantonly caused or contributed to the injury or wrongful death."

We hold that "intentional wrongdoing" is necessarily included in the statutory definition of "fault." *Thomas,* 187 Ariz. at 489–90, 930 P.2d at 1003–04 ("The legislature defined fault broadly to include all types of fault committed by all persons."); *see also Preferred Risk Mut. Ins. Co. v. Tank,* 146 Ariz. 33, 35, 703 P.2d 580, 582 (App.1985) ("What is necessarily implied in the statute is as much a part of it as what is expressed.").

In arguing that a defendant cannot shift responsibility for fault it had a duty to guard against, Plaintiffs rely on what they refer to as "an analogous context of crashworthiness cases," such as *Cota v. Harley Davidson,* 141 Ariz. 7, 684 P.2d 888 (App.1984). In *Cota,* Harley Davidson was accused of failing to design a crashworthy motorcycle and was denied jury instructions on assumption of risk, product misuse, and unforeseen use. *Id.* at 12–14, 684 P.2d at 893–95. The court held that because motorcycle crashes were foreseeable, there could be no product mis-

use defense on the facts of the case. *Id.* at 14, 684 P.2d at 895. *Cota* issued before Arizona adopted comparative fault, and we will not speculate on how the case would be decided today. We note, however, that A.R.S. section 12–2506(F)(2) expressly includes "product liability and misuse" in its definition of "fault."

## Bifurcation of Trial

■ The City requested and was denied separate trials on liability and damages. The City argued that trying the issues together would allow the jury to hear emotional, sympathy-provoking testimony from damages witnesses with nothing to say about liability. Rule 42(b) vests the trial court with broad discretion to decide whether to bifurcate a trial on liability and damages. *Morley v. Superior Court*, 131 Ariz. 85, 87, 638 P.2d 1331, 1333 (1981). There were emotional issues in this case, as in most wrongful death cases, and we find no abuse of trial court discretion in denying the pretrial motion to bifurcate.

## Damages

■ The City argues that the damages verdicts resulted from jury passion and prejudice. The appropriate test of passion or prejudice is whether the verdict is " 'so manifestly unfair, unreasonable and outrageous as to shock the conscience of the Court.' " *Acheson v. Shafter*, 107 Ariz. 576, 579, 490 P.2d 832, 835 (1971) (quoting *Young Candy & Tobacco Co. v. Montoya*, 91 Ariz. 363, 370, 372 P.2d 703, 707 (1962)).

■ A parent's loss of a child can be both devastating and difficult to measure. Valuation of that loss can be heavily influenced by witness demeanor and credibility. The damages testimony reflected that Plaintiff Hutcherson and her daughter were close and that mother actively contributed to daughter's growth and self-improvement efforts. Following Burt's death, Plaintiff Hutcherson was extremely depressed, suffered from anxiety, and had difficulty working. Plaintiff

Usher was also devastated by the loss of her son. The jury heard from several sources about the close relationship between mother and son. Usher provided financial and emotional support for his mother and always intended to "take care of her." We find in this record evidence to support the damages verdicts, and no legal reason to disturb them. *See Valley Nat'l Bank v. Brown*, 110 Ariz. 260, 264, 517 P.2d 1256, 1260 (1974) (noting that jury damage awards not disturbed unless the result of passion, prejudice, or a disregard of the evidence).

## Apportionment of Fault

■ In its motion for new trial, the City argued that the apportionment of fault was "against the weight of the evidence" and it requested relief pursuant to Rule 59(a)(8), which provides that a new trial may be granted if the verdict "is not justified by the evidence." The record reflects that the trial court doubted its authority to grant either a remittitur or a new trial on apportionment of fault, for that issue was a new one in Arizona. We hold that Rule 59 provides authority for granting a new trial on apportionment of fault.

■ The fact finder has to determine and apportion the "relative degrees of fault of all defendants and nonparties...." A.R.S. § 12–2506(C) (Supp.1995). Fault is to be apportioned without regard to the wealth of those found to be at fault. *Thomas*, 187 Ariz. at 490, 930 P.2d at 1004 (recognizing that "dismal prospect" for recovery from tortfeasor is irrelevant to allocation of fault). The jury apportioned seventy-five percent of the fault to the City and twenty-five percent to the deceased murderer. We conclude that the apportionment of fault is unjustified by the evidence and that the trial court abused its discretion in denying the City's motion for new trial on apportionment of fault.

In arguing apportionment to the jury, Plaintiffs' theorized that, because the City had a duty to prevent Gardner from doing what he did, the City should be responsible

for everything Gardner did. Plaintiffs' last words in rebuttal argument were:

On behalf of the Plaintiffs, I would ask you, after you consider all of the evidence, to render a verdict that's full and fair to Alma, and to Luella, and that you not deduct any percentage by applying fault to Craig Gardner. It was [the City's] job to prevent Craig Gardner from doing what he did, therefore, standing the whole idea on his head, and you shouldn't apply any percent to Craig Gardner. Thank you.

In opposition to the City's motion for new trial, Plaintiffs combined that same argument with an apparent "quotient verdict" argument; they argued that "some jurors may very well have thought that no percentage of fault should be applied against Craig Gardner because it was the duty of the City to prevent this harm from ever occurring." Plaintiffs certainly did have to prove that the City's breach of duty was a cause of Plaintiffs' harm: if that proof was lacking, the City was entitled to a defense verdict. The jury having found both the City and Gardner at fault, its next job was to fairly apportion that fault, to measure and weigh the fault of the City in relation to that of Gardner. Finding fault is not the same as apportioning it; if it were, everyone found to be at fault would be jointly and severally liable for all the damages. That is what the law used to be in Arizona, until it was repealed and replaced with a comparative fault scheme. Fault is now a relative concept in Arizona civil cases: whether an actor's fault is large or small depends to a significant extent on how it compares to the other fault in the case. For example, if A's fault is, say, a 9 and B's fault is a 9, then A is responsible for 50 percent of the total fault. But if A's fault is a 9 and B's fault is a 90, then A is responsible for 10 percent of the total fault.

■ Plaintiffs argue that the jury's apportionment of fault is supportable on three theories: First, comparative fault is an affirmative defense the jury could have decided not to apply; second, the City did not prove that Gardner was sane; and third, the jury

could have decided to assign more fault to a breach of duty to protect from criminal conduct than to the criminal conduct itself. The first two arguments are contrary to law and the third is unjustified by the evidence. First, as a matter of law, the jury was not free to disregard the court's instructions to apportion the fault of all persons who contributed to the alleged injury. *Styles v. Ceranski*, 185 Ariz. 448, 451–52, 916 P.2d 1164, 1167 (App.1996). Second, a criminal is presumed to be sane. *State v. Berndt*, 138 Ariz. 41, 45, 672 P.2d 1311, 1315 (1983). If Plaintiffs contended that Gardner was insane, they had the burden of proving that contention and they made no effort to do so. The record contains no evidence that Gardner was not responsible for his actions. Third, although the evidence in some cases may be such that a negligent actor could be more at fault than an intentional wrongdoer, no such evidence exists in this case.

In *Rosh v. Cave Imaging Systems, Inc.*, 26 Cal.App.4th 1225, 32 Cal.Rptr.2d 136, 139 (1994), a security company was held seventy-five percent at fault for a shooting committed by a fired employee whom the guards repeatedly allowed back onto the secured premises—despite several notifications by the victim that this person was on the premises and should not be, and several assurances by defendant's guards who said they would "take care of it" and then did nothing. The court found the security company's conduct "egregious" and the verdict was affirmed. *Id.* 32 Cal.Rptr.2d at 141. In contrast to the *Rosh* defendant's repeated opportunities and specific orders to keep a certain person out of premises that were controlled by the defendant, the City's 911 operator had to make all her decisions based on one ambiguous call to an emergency number that received an average of 1,940 calls a day. We find the apportionment of fault to the City in this case comparable to that in two cases where the apportionment verdict was set aside as unjustified by the evidence.

In *Scott*, a grandmother who "disciplined" her granddaughter by immersing her legs in

scalding water until she was burned to the bone was found one percent at fault—and the agency and caseworker who negligently left the child in the grandmother's care were found to be a total of ninety-nine percent at fault. *Scott*, 32 Cal.Rptr.2d at 649. The agency and the caseworker had prior information and some evidence that the grandmother was abusive to the child, but they had done nothing about it. *Id.* Even so, the court held that "[n]o reasonable jury could conclude that [grandmother's] fault was as trifling as the jury's allocation would suggest," and it reversed and remanded for new trial on apportionment of fault. *Id.* at 655–656, 659.

In another California case, a plaintiff who was raped by a stranger in the dark, underground garage of her "secure" apartment building sued the landlord and the property management company—and the jury assigned ninety-five percent of the fault to those defendants, four percent to the rapist and one percent to his accomplice. *Pamela B. v. Hayden*, 31 Cal.Rptr.2d 147, 150 (App. 1994). The landlord and property owner had ignored repeated complaints of inadequate lighting in the underground garage, and the garage was not "secure;" it was easily entered by anyone. *Id.* at 150. Advising that "we cannot leave our common sense on the courthouse steps, which is what we would have to do to affirm the allocation made by the jury in this case," the court reversed and remanded for new trial on apportionment of fault. *Id.* at 159–60. The court also asked a question which might be asked in this case:

> How can the man who [intentionally injured the plaintiff] be only four percent at fault for her injuries? To ask that question compels the answer. He cannot. (*Cf. Rangel v. Graybar Electric Co.* (1977) 70 Cal.App.3d 943, 946, 139 Cal.Rptr. 191; *Knott v. State of California* (1994) 23 Cal. App.4th 210, 234, 28 Cal.Rptr.2d 514 [when one defendant's conduct was negligent, it is reasonable to assume the jury will apportion fault so that the one who acted intentionally should bear 'most if not all of the blame'].)

*Id.* at 160.

Interestingly, *Pamela B.* and *Knott* were cited by the Louisiana Supreme Court in support of its decision that negligence should not in all cases be compared with intentional fault because:

> Given the fact that any rational juror will apportion the lion's share of the fault to the intentional tortfeasor when instructed to compare the fault of a negligent tortfeasor and an intentional tortfeasor, application of comparative fault principles in the circumstances presented in this particular case would operate to reduce the incentive of the [the negligent defendant] to protect against the same type of situation occurring again in the future.

*Veazey v. Elmwood Plantation Associates, Ltd.* 650 So.2d 712, 719 (La.1994).

In conclusion, we are well aware that an appellate court should rarely disturb a jury's verdict and we have reviewed the record with that policy and the following principles in mind:

> It is, of course, the invariable rule of this court that, where there is a dispute in the evidence from which reasonable [persons] could arrive at different conclusions as to the ultimate facts, we will not disturb the findings of a trial court or the verdict of a jury because we do not agree with the conclusion reached. On the other hand, if there is no evidence in the record which would justify such a conclusion by the triers of fact, it is not only our right, but our duty, to set aside a verdict.

*Spain v. Griffith*, 42 Ariz. 304, 305, 25 P.2d 551, 551 (1933).

We conclude that there is no evidence in this record which would justify a verdict finding the City seventy-five percent at fault for the wrongful deaths of Plaintiffs' children. In regard to the dissent we express respectful disagreement but no comment.

## Partial Retrial

■ A partial retrial is appropriate when the issues are not "inextricably entwined" and the possibility of prejudice is slight. *Styles*, 185 Ariz. at 450–51, 916 P.2d at 1167;

*Martinez v. Schneider Enters.*, 178 Ariz. 346, 349, 873 P.2d 684, 687 (App.1994). We find that the liability and damage verdicts were justified by the evidence and were neither inextricably entwined with nor tainted by the unjustified apportionment of fault; we therefore conclude that partial retrial is an adequate remedy. *See Saide v. Stanton*, 135 Ariz. 76, 80, 659 P.2d 35, 39 (1983) (when error relates to one issue, issues may be severed and new trial confined to contaminated issue); *see also Martinez*, 178 Ariz. at 350, 873 P.2d at 688.

### Conclusion

The judgments are affirmed on liability and damages and reversed and remanded for new trial on apportionment of fault.

THOMPSON, J., concurs.

GRANT, Judge, concurring in part and dissenting in part,

I concur in the majority's affirmance of the judgments on liability and damages. I dissent from the reversal on apportionment of fault. The majority states no legal principle which was violated by the verdict. Further, the majority offers no standard by which trial judges in future cases are to be guided or to instruct juries.

I believe the majority is substituting its view of the evidence for that of the jury and of the trial court. This is not the proper role of an appellate court. The statute and prior case law provide no formula for comparison of fault, nor does the majority opinion. Some of the factors the fact finder may consider in determining percentages of responsibility are: 1) contribution to causation; 2) culpability of conduct—the degree of departure from the applicable legal standard; 3) relative timing of the conduct; and 4) the responsibility to avoid harm. The third factor subsumes the former doctrine of "last clear chance" into the comparative negligence scheme. The fact finder may consider relative timing in allocating responsibility for harm. The fourth factor for the fact finder to consider is responsibility to avoid harm.

The jury gets to weigh the responsibility of foresight and avoidance as factors in allocating relative degrees of fault. *See, Jimenez v. Sears, Roebuck and Co.*, 183 Ariz. 399, 402, 904 P.2d 861, 864 (1995). We have recognized that the general good of the present version of the Uniform Contribution Among Tortfeasors Act ("UCATA") is to make each tortfeasor responsible for *only* its share of fault. *Id.* at 405, 904 P.2d at 867. *Jimenez* supports the idea that the prohibition against damage limitations is not violated by making concurrent "last clear chance" a comparative, rather than an absolute defense. The change essentially regulates responsibility for cause rather than limiting the damages recoverable. Therefore it was proper for the fact finder to weigh the operator's responsibility for foresight and avoidance.

The majority ignores factors three and four. The murderer's culpability is enormous, the operator's is slight. He committed deliberate homicide; she misjudged the severity of the call. And when it comes to contribution to causation, at first blush, the imbalance again weighs heavily toward the murderer. When you add relative timing into the picture, however, the balance starts to shift. The operator has notice of a potentially imminent harm and a chance to avoid it. This is a proper factor for the fact finder to weigh. It is also proper for the fact finder to weigh the operator's responsibility for foresight and avoidance. It enters into the weighing of relative degrees of fault.

As for who gets to do the weighing, this is uniquely a jury issue. An appellate court has no special sensors which equip it to do a better job of allocating fault. The court should be very reluctant to compare the actions of an intentional tortfeasor with the responsibility of a negligent tortfeasor (having not only the duties of foresight, avoidance and notice, but also, an arguable chance to avoid the harm), and to then declare that the jury got the balance among those intangible factors wrong.

The majority gives enormous weight to comparative culpability. The jury gave

greater weight to comparative responsibility for avoidance. The majority holds that the jury's apportionment of fault is not supported by the evidence, stating: "[T]he evidence does not justify a verdict that the 911 operator was three times as much at fault for the wrongful deaths of Plaintiffs' decedents as Gardner, who intentionally shot and killed Plaintiffs' decedents." *ante* p. 187, 933 P.2d p. 1255. This is an erroneous analysis because the 911 operator is neither a party nor a defendant in this case. The defendant is the City of Phoenix, a municipal corporation, which is solely responsible for maintaining the 911 system.

The majority's view does not explain why a seasoned trial judge, who also heard the evidence, denied the City's Motions for New Trial, for Judgment Notwithstanding the Verdict and for Remittitur.

The majority is analyzing this appeal with an improper standard of review. Although the majority gives lip service to the requirement of law that an appellate court must view the facts in the light most favorable to sustaining the verdict and judgment, *McFarlin v. Hall*, 127 Ariz. 220, 224, 619 P.2d 729, 733 (1980), it then proceeds to reweigh the evidence. As the majority states: "We have heard the tape of Burt's 911 call; all voices on it sound relatively calm and controlled." That is not a decision or finding of fact for an appellate court to make. As the majority admits, one of the jury's duties is to "determine and apportion" the "relative degrees of fault of the respective parties and any nonparties at fault." A.R.S. section 12–2506(C) (Supp.1993). Again, the majority keeps referring to the fault of the 911 operator as though she were a defendant in this case.

The majority states that the apportionment of fault "is unjustified by the evidence and that the trial court abused its discretion in denying the City's motion for new trial on apportionment of fault." This is not a legal analysis of an appellate issue; but rather the majority substituting its judgment for that of the jury and the trial court. The majority states it is our duty to set aside a verdict when the record contains *no* evidence to

justify it. *Spain v. Griffith*, 42 Ariz. 304, 307, 25 P.2d 551, 552 (1933). No appellate court reviewing the evidence presented in this case could determine that *no* evidence supported the apportionment of fault.

We are all well aware that our society is rife with violent crime and domestic violence. We are well aware that the criminally insane exist and are an ever-present danger to everyone. Our only buffer for our well-being and safety is our law enforcement agencies and officers. Through their often heroic and always under-appreciated efforts, many more lives are saved than we can ever even know, let alone count. However, the comfort we take in our law enforcement agencies' ability to protect us is only as well-grounded as our ability to quickly access competent law enforcement when an emergency arises, or when we are confronted with danger. Without the 911 system, our ability to quickly access law enforcement would be rendered impotent and the public would be left unprotected in this type of circumstance. Crime and criminal insanity will never disappear; therefore, the efficiency and accuracy of the 911 system is crucial. For these reasons, I cannot say that on this record, the trial court abused its discretion by finding that both the verdict and the apportionment of fault were supported by the evidence. Furthermore, the majority opinion cites nothing in this record that supports a contrary conclusion.

The standard of review for this issue on appeal is whether the trial court abused its discretion in determining whether the verdict was supported by the evidence.

It is a well-settled rule of law that the granting of a new trial is largely within the discretion of the court, and that the appellate court will not disturb the ruling except for an abuse of discretion. The discretion in this sense is a legal discretion, based on reason and law. Where the showing for a new trial is insufficient both in form and substance there is no discretion to be exercised.

(citations omitted) *Mayo v. Ephrom*, 84 Ariz. 169, 172, 325 P.2d 814, 816 (1958).

In *Mayo v. Ephrom*, the trial court granted remittitur; plaintiffs did not remit and the trial court granted a new trial on the ground that the verdict was excessive as the result of the passion and prejudice of the jury. *Id.* Arizona has also long recognized that verdicts which are shockingly large or small may be the result of something other than passion and prejudice. *Waqui v. Tanner Bros. Contracting Co., Inc.*, 121 Ariz. 323, 327, 589 P.2d 1355, 1359 (App.1979). This same reasoning must also apply to apportionment of fault.

> The greatest possible discretion is given to the trial court with respect to the alteration of the verdict ... because, like the jury, it has had the opportunity to hear the evidence and observe the demeanor of witnesses.

*Mammo v. State,* 138 Ariz. 528, 533–34, 675 P.2d 1347, 1352–53 (App.1983). This court should give the greatest possible discretion to the trial court concerning its refusal to alter the verdict.

If any substantial evidence could lead reasonable persons to find ultimate facts sufficient to support the verdict, we will affirm the judgment. *Styles v. Ceranski, M.D., Ltd.*, 185 Ariz. 448, 450–51, 916 P.2d 1164, 1167 (App.1996); *see also A.R. Teeters & Assoc., Inc. v. Eastman Kodak Co.*, 172 Ariz. 324, 328, 836 P.2d 1034, 1038 (App.1992) (sufficiency of evidence presented at trial is reviewed only to determine if substantial evidence exists in the record to support the trial court's judgment).

The Plaintiffs have presented substantial evidence to support the jury's apportionment of fault. Their evidence shows the City: (1) failed to assign the appropriate priority to the victim's 911 call, (2) did not forward the supplemental dispatch card which had critical information to the police radio dispatcher, and (3) induced the victim to remain in the apartment in reliance on the operator's assurance of prompt police response at that location.

The 911 operators categorize incoming calls by priority of response needed for the situation. In general, the higher the priority, the more rapid the response time. Priority 1 is the highest priority. While the City provides guidelines for determining the priority of 911 calls, the operator also must use his or her judgment in making a determination as to the appropriate priority for each call. The operators receive extensive training from the City to enable them to do this.

Priority 1, or "hot calls," are those which indicate a crime is in progress or a crime has just occurred. According to the City's policy, incoming calls are Priority 1 if they are of a serious nature or someone is in immediate, personal danger. Domestic violence calls are Priority 1, according to the City's policy, if there is an assault in progress or weapons are involved, such as when one spouse/person is hitting, beating, striking, or harming the victim in any physical manner.

Priority 2 calls involve crimes of an urgent, but not life-threatening, nature. In the domestic violence context, a Priority 2 designation is justified when no physical abuse is occurring, but there is an argument or verbal disagreement.

Finally, Priority 3 is an appropriate designation if the caller is reporting a crime after the fact. Service calls, such as the recovery of stolen property, are also Priority 3. The City's policy is that domestic violence calls must *never* be entered as Priority 3.

Here, the 911 operator rated the victim's call as Priority 3. The jury may have reasonably inferred that domestic violence precipitated the victim's 911 call because she explained to the operator in great detail the nature and recency of the killer's threats and the interrelationships between the killer, the other victim and herself. In addition, the victim told the operator a gun was present at the scene. From the tape of the call and the testimony of the witnesses, the jury could have reasonably inferred that the crime of threatening and intimidating had been ongoing and was currently in progress, thereby requiring a heightened priority. Therefore, substantial evidence existed to support a determination by the jury that the City,

through its operator, was negligent in not assigning the call a higher priority. Moreover, the jury could have determined that the City failed to comply with its own domestic violence policy and that, but for the City's negligence, the police could have prevented the deaths of the two victims.

The City's policy also requires that 911 operators place a completed supplemental dispatch card on a conveyor belt which transfers it to the police radio dispatch. The supplemental dispatch card contains information relating to the call which the 911 operator cannot enter into the computer because of space limitations. Here, the operator had written on the card: "complainant said her new boyfriend threatened, that is 236, to shoot ex if he did any damage." The reference to 236 is the police code for a threat. The operator admits she failed to place the card on the conveyor belt after completing the call with the victim. The operator also admits it was a "mistake" not to put the supplemental dispatch card on the conveyor belt. It is reasonable, therefore, for the jury to infer that the officer dispatched to the scene needed to know, for his own safety and the safety of others, that a threat was in progress and a weapon was present.

There is sufficient evidence of one other error in judgment by the operator which also affirms the jury's apportionment of fault. The operator verified with precision the exact address of the victims. Then, the operator said: "We'll send an officer out there ... if he happens to show up at the apartment before the officers first do, just call us back right away, okay?" A jury could have reasonably inferred that by telling the victim that the City would send a police officer to meet her at the apartment, the operator was telling the victim to stay put and wait for the officer. This was said in spite of the fact that the victim told the operator that the killer lived less than five minutes away. Therefore, a jury could have reasonably determined that the victim relied on the City's promise to provide prompt police protection, after being told to wait at the apartment.

UCATA had the twofold purpose of effectively abolishing the common law doctrines of contributory negligence and joint and several liability, and replacing them with the statutorily defined concept of pure comparative fault. A.R.S. sections 12–2501–2506 (Supp. 1993). The practical effect of UCATA was to remove the harsh results of the contributory negligence defenses, which permitted a negligent defendant to escape liability if there was contemporaneous negligence by the plaintiff, no matter how negligible. UCATA also abolished joint and several liability among tortfeasors and provided for the apportionment of damages according to the degree of relative fault. Here, the majority remands for a new trial, and a new outcome, on the question of apportionment of fault because the 75% apportionment of fault to the City appears to the majority to be contrary to the legislative intent of the comparative fault statute. Unfortunately, the majority fails to make the necessary interpretation of the statute to explain its view that a different outcome is mandated by the statute. The majority simply substitutes its view of the evidence for that of the jury and the trial court, without setting forth any legal standard for doing so.

A.R.S. section 12–2506(F)(2) defines fault as:

> "an actionable breach of legal duty, act or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence in all of its degrees, contributory negligence, assumption of risk, strict liability, breach of express or implied warranty of a product, products liability and misuse, modification or abuse of a product."

The majority states, "given the broad definition of fault in section 12–2506(F)(2), and the clear directive in section 12–2506(B) to compare *all* fault, we conclude that the Arizona comparative fault statutes should be interpreted as requiring comparison of all types of fault, including intentional wrongdoing." *ante* p. 192, 933 P.2d p. 1260 (emphasis in original). Although I agree with this statement by the majority, from a jurisprudential perspective, I am concerned about

the ability of the trier of fact to apportion fault between intentional and negligent tortfeasors because such misconduct is both different in "degree" and in "kind." *See* B. Scott Andrews, *Premises Liability—The Comparison of Fault Between Negligent and Intentional Actors*, 55 La.L.Rev. 1149 (1995); Jordan M. Leibman, *Comparative Contribution and Intentional Torts: A Remaining Roadblock to Damages Apportionment*, 30 Am.Bus.L.J. 677 (1993). Undoubtedly, this same concern has led the majority to substitute its judgment for that of the jury and the trial court. I agree with the majority that because the legislature has effectively abolished joint and several liability, thereby prohibiting one tortfeasor from seeking contribution from another, we are left with no alternative but to conclude that all "degrees and kinds" of tortious conduct fall under this statute.

The jury heard the evidence and apportioned 75% of the fault to the City because of its negligence in providing and operating the 911 service, and apportioned 25% of the fault to the subsequent intentional acts of the killer. The jury's apportionment of fault is justified by the evidence presented in this case because the victims' harm occurred within the scope of the protection extended to them by the City.

In *Styles*, the jury held Dr. Ceranski solely at fault for medical negligence to Styles and awarded Styles four million dollars in damages. *Styles*, 185 Ariz. at 449–50, 916 P.2d at 1166. The jury assigned no fault to the codefendant, Dr. Szokol. *Id.* This court reversed because there was no evidentiary support for a verdict that Dr. Ceranski was at fault but Dr. Szokol was not. *Id.* The issues and verdict were impacted by the trial court's error in allowing three of Styles' damage witnesses to become standard of care witnesses as well. The case was remanded for a new trial on *both* the liability and damages issues. *Id.* at 454, 916 P.2d at 1170. In *Styles*, we held the trial court's denial of a motion for new trial will be reversed only if it reflects a manifest abuse of discretion given the record and circumstances of the case. *Id.* at 450, 916 P.2d at 1166 (citing *Blakely*

*Oil, Inc. v. Wells Truckways, Ltd.*, 83 Ariz. 274, 278, 320 P.2d 464, 466 (1958)). The majority fails to demonstrate a manifest abuse of discretion in the record and circumstances of this case. The majority substitutes its view of the evidence for that of the jury and the trial judge, all of whom actually saw and heard the testimony and measured the credibility of each witness. Unlike in *Styles*, in this case the jury did not ignore the applicable comparative fault law; the jury apportioned fault between the defendants. The majority opinion is based on its disapproval of the jury's apportionment of fault. The standard of review applied by the majority is improper and incorrect as to this issue. *See Mammo v. State*, 138 Ariz. 528, 532, 675 P.2d 1347, 1351 (App.1983).

I cannot say that a seasoned trial judge, who heard the evidence and denied the City's Motions for New Trial, for Judgment Notwithstanding the Verdict, and for Remittitur, abused his discretion in determining that the facts supported this verdict, including the apportionment of fault. Therefore, I would affirm the judgment in all respects.